# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––

**No. ACM 39903 (f rev)**

––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Jesus MARTINEZ**
Airman First Class (E-3), U.S. Air Force, *Appellant*

––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 31 May 2022[1]

––––––––––––––––––

*Military Judge:* Christopher M. Schumann; Andrew R. Norton (remand).

*Sentence:* Sentence adjudged on 30 August 2019 by GCM convened at Fairchild Air Force Base, Washington. Sentence entered by military judge on 18 October 2019 and reentered on 22 June 2021: Dishonorable discharge, confinement for 6 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF (argued); Major Rodrigo M. Caruço, USAF; Allison R. Weber, Esquire (argued).

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Alex B. Coberly, USAF; Major Brian E. Flanagan, USAF; Major John P. Patera, USAF (argued); Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Chief Judge JOHNSON and Judge ANNEXSTAD joined.

––––––––––––––––––

[1] The court heard oral argument in this case on 10 December 2021.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault and one specification of attempted sexual assault, in violation of Articles 120 and 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 880.[2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority has approved the sentence as adjudged.[3]

Appellant has raised 11 issues, one of which asserts an error in the post-trial processing of Appellant's court-martial: that the convening authority erred by not taking action on Appellant's sentence as required by Executive Order 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018), and Article 60, UCMJ, 10 U.S.C. § 860 (*Manual for Courts-Martial*, *United States* (2016 ed.) (2016 *MCM*)). In an earlier opinion, this court agreed with Appellant and remanded his case to the Chief Trial Judge, Air Force Trial Judiciary, for corrective action. *See United States v. Martinez*, No. ACM 39903, 2021 CCA LEXIS 250, at *7–8 (A.F. Ct. Crim. App. 21 May 2021) (unpub. op.). The convening authority subsequently approved Appellant's sentence, resulting in a new entry of judgment. With this error having been corrected, we now turn to Appellant's remaining ten issues, along with a supplemental issue raised subsequent to our first opinion on this case.

_____

[2] References to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial*, *United States* (2016 ed.). Unless otherwise specified, all other references to the UCMJ, the Military Rules of Evidence (Mil. R. Evid.), and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[3] On 31 March 2022, we issued an unpublished opinion in this case. *United States v. Martinez*, No. ACM 39903 (f rev), 2022 CCA LEXIS 202 (A.F. Ct. Crim. App. 31 Mar. 2022) (unpub. op.). On 29 April 2022, Appellant moved for reconsideration of this decision with respect to whether the military judge abused his discretion by failing to recuse himself. On 2 May 2022, the Government moved for reconsideration with respect to our decision to set aside of the finding of guilty as to the Specification of Charge II, and suggested this court consider the case *en banc*. On 20 May 2022, we granted both motions for reconsideration, but we denied the Government's *en banc* suggestion after a unanimous vote against such request. After reconsideration, we withdraw the court's 31 March 2022 opinion and substitute this opinion.

The assignments of error Appellant has raised through counsel are: (1) the military judge should have recused himself from Appellant's trial; (2) the military judge failed to take appropriate action with respect to a witness who refused to disclose contact information for another witness; (3) the military judge erred in reconsidering an earlier ruling; (4) the evidence is legally and factually insufficient to support Appellant's attempted sexual assault conviction; (5) the military judge should have granted a motion for a finding of not guilty with respect to the attempted sexual assault specification; (6) the military judge failed to instruct the members on the overt acts forming the basis for the attempted sexual assault offense; (7) the record of trial is defective and incomplete; (8) Appellant's record was not docketed with this court within 150 days of his sentencing; and (9) the cumulative error doctrine requires relief. Appellant personally raised a tenth issue pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (10) the military judge erred in a ruling under Mil. R. Evid. 412 which prohibited the Defense from cross-examining a victim on a particular matter.[4]

Regarding Appellant's sixth assignment of error, we conclude the military judge's instructions with respect to the attempted sexual assault offense were erroneous, and we dismiss this specification without prejudice. As a result, Appellant's fourth and fifth assignments of error are moot, and we defer his eighth assignment of error until the record is returned to this court for completion of our review under Article 66(d), UCMJ, 10 U.S.C. § 866(d).

Appellant also personally raises as a supplemental eleventh issue his claim that the Constitution guarantees him the right to a unanimous verdict, a right not reflected in the current court-martial framework. We have carefully considered this issue as well as Appellant's ninth assignment of error and find neither warrants further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).[5]

---

[4] We granted oral argument on the first two of Appellant's assignments of error. We further directed oral argument on two specific issues: whether we were permitted to consider matters from another court-martial in assessing whether the military judge should have recused himself; and whether the military judge erred in not ordering the production of the witness whose contact information was not disclosed in Issue (2).

[5] Appellant raises this claim under *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), along with both the Fifth and Sixth Amendments. U.S. CONST. amend. V, VI. However, our superior court has held "there is no Sixth Amendment right to trial by jury in courts-martial." *United States v. Easton*, 71 M.J. 168, 175 (C.A.A.F. 2012) (citations omitted); *see also United States v. McClain*, 22 M.J. 124, 128 (C.M.A. 1986) (noting that "courts-

## I. BACKGROUND

In August 2018, while stationed at Fairchild Air Force Base, Washington, Appellant met Ms. KT—a civilian college student who lived about 90 minutes away—through an online dating application. A few days after meeting Appellant online, Ms. KT drove to Appellant's off-base house and spent the weekend with him, during which time the two embarked upon a fast-moving and sexually intimate relationship. Ms. KT returned home Monday morning, and she and Appellant made plans to see each other the following weekend, with Ms. KT making the trip back to Appellant's house that Friday evening. Appellant and Ms. KT engaged in consensual sexual intercourse Sunday night, but at some point after Ms. KT had fallen asleep, Appellant woke her up in order to initiate further sexual conduct. Despite telling Appellant "no" and physically trying to prevent his advances, Appellant penetrated Ms. KT's vagina with his penis until he ejaculated; he did not use a condom.

Ms. KT spent the following day with Appellant until early in the afternoon when she drove back to her house. Before she left, the two went shopping for an emergency contraceptive, which Appellant purchased for Ms. KT. After a few days passed, she reported to civilian law enforcement that Appellant had assaulted her, and military authorities were subsequently notified. In the ensuing investigation, Air Force Office of Special Investigations agents interviewed Ms. ES—Appellant's then-wife who was seeking a divorce from Appellant. Ms. ES disclosed that Appellant had attempted to sexually assault her in the middle of July 2018, an offense which she had not previously reported.[6] Appellant was charged with, and convicted of, sexually assaulting Ms. KT and attempting to sexually assault Ms. ES. He was also charged with, but acquitted of, committing abusive sexual contact on Ms. ES.

---

martial have never been considered subject to the jury-trial demands of the Constitution"). The United States Supreme Court similarly concluded neither the Fifth Amendment nor the Sixth Amendment creates a right to a jury in a military trial in *Ex parte Quirin*, 317 U.S. 1, 45 (1942). *See also Whelchel v. McDonald*, 340 U.S. 122, 127 (1950) ("The right to trial by jury guaranteed by the Sixth Amendment is not applicable to trials by courts-martial or military commissions. . . . The constitution of courts-martial . . . is a matter appropriate for congressional action."); *Ex parte Milligan*, 71 U.S. 2, 123 (1866); *United States v. Anderson*, No. ACM 39969, 2022 CCA LEXIS 181, at *56–57 (A.F. Ct. Crim. App. 25 Mar. 2022) (unpub. op.) (concluding *Ramos* does not create a requirement for unanimous court-martial verdicts).

[6] Appellant and Ms. ES had divorced by the time of Appellant's court-martial.

## II. DISCUSSION

### A. Military Judge Recusal

Appellant argues the military judge was biased against the lead trial defense counsel, and the military judge should have therefore recused himself from Appellant's court-martial. Appellant argues as a second basis for relief that the military judge should have recused himself based upon the appearance of bias on the military judge's part. As a remedy, Appellant asks us to set aside the findings and sentence. In support of his argument, Appellant cites to a number of events occurring both before and during his court-martial; we only address the most significant events raised.

#### 1. Additional Background

##### a. Motion for Recusal

Appellant's court-martial began with a two-day-long motions hearing on Thursday, 22 August 2019. The trial itself started Monday, 26 August 2019, with Appellant being represented by a circuit defense counsel as lead counsel along with a more junior area defense counsel. The military judge had previously issued a scheduling order in April 2019 which set a deadline of 22 July 2019 for filing motions.

On 15 July 2019—one week before that deadline and more than a month before the motions hearing—the Defense asked the military judge via email for permission to delay filing a motion "pertaining to charging defects" until trial, because making the motion sooner "would simply allow the Government the opportunity to correct the defects." Alternatively, the Defense sought permission to file the motion *ex parte*. Less than ten minutes later, the military judge sent a reply email to both parties in which he denied both the Defense's request to file the motion late and the request to file the motion *ex parte*. That same day, the Defense submitted a written motion asking the military judge to reconsider his ruling. The Defense argued the military judge's scheduling order was in conflict with the Rules for Courts-Martial insofar as the order set deadlines in advance of those found in the rules.[7] The Government opposed reconsideration, and, on 20 July 2019, the military judge sent the parties an email in which he said he had reconsidered his ruling on the Defense's motion for relief from the scheduling order deadline, and he was again denying the Defense's motion as well as the proposed alternative relief of an *ex parte* filing.

---

[7] Under R.C.M. 905(b)(2), a motion asserting a failure to state an offense may be resolved at any time during a court-martial. The Defense proposed serving their motion on the Government "after arraignment or empanelment, and the court can recess for however long is necessary to provide the trial counsel the opportunity to respond on the merits."

The next day, the Defense submitted a motion to dismiss the attempted sexual assault charge under the theory that the charge's specification failed to state an offense. The tenor of the motion was that the specification did not provide Appellant adequate notice because it did not explain either how Appellant attempted to sexually assault Ms. ES or why he was unable to complete the offense. The Defense implied in the motion that by being compelled to submit the motion earlier than required by the Rules for Courts-Martial, there may be an appearance of the Defense "attempting to assist the Government perfect their case." The Government opposed this motion, arguing it had no obligation to allege specific acts which "amount to an attempt." Trial counsel also added in their motion this line: "General gripes about the Government's charging in this case may be therapeutic to express in a motion, but they do not give rise to the requested remedy. Had the Defense requested in a Bill of Particulars this information, it would have been theirs."[8] Trial counsel did not comment on the Defense's claim regarding the timing of the motion.[9]

During the week of 12 August 2019—that is, the week before the motions hearing—the Air Force's circuit trial and defense counsel, along with all the military trial judges, participated in the Air Force Circuit Advocacy Training workshop at Joint Base Andrews, Maryland. During the workshop, the Chief Trial Judge of the Air Force Trial Judiciary conducted a session with the circuit defense counsel in which he asked the counsel for their feedback with respect to the Air Force trial judges. Afterwards, the Chief Trial Judge held another session with just the trial judges, all of whom are subordinate to, and in the rating chain of, the Chief Trial Judge. In that session, the Chief Trial Judge explained that one of the circuit defense counsel had raised a concern about a military judge requiring defense counsel to disclose details of a particular motion earlier than required by the *Manual for Courts-Martial*. The military judge detailed to Appellant's court-martial participated in this session and concluded that the defense counsel in question was the circuit defense counsel in Appellant's case, and that the motion being referenced was the one he had denied a few weeks earlier. When the session concluded, the military judge approached the Chief Trial Judge and explained that the motion pertained to an ongoing court-martial and that, as a result, he was "probably going to mention it on the record."

---

[8] The Defense had submitted a request for a bill of particulars, but trial counsel contended it did not specifically request information pertaining to the conduct underlying the attempt specification.

[9] The military judge later denied the motion after the motions hearing but before trial on the merits began. He concluded that Appellant was on adequate notice of the offense he was to defend against.

After the workshop, but before the motions hearing, the military judge issued a written ruling on the Defense's reconsideration motion seeking relief from the scheduling order. The military judge's ruling denying the Defense motion was largely rooted in the prohibition of using *ex parte* communications for the purpose of gaining a tactical advantage over the other party. Because the Government would be able to withdraw defective specifications and then re-refer them to a new court-martial, the military judge reasoned that permitting the Defense to untimely file their motion would have little practical impact other than either delaying Appellant's trial or subjecting Appellant to a second court-martial. The military judge further rejected trial defense counsel's contention that they may "violate a potentially invalid modification of the [Rules for Courts-Martial] by directly ignoring a now direct requirement from this court to file the motion and serve all parties." In doing so, the military judge posited that it was a routine practice of military judges to set deadlines earlier than those found in the Rules for Courts-Martial in order to promote efficiency in the trial process. The military judge then noted that while he could not prevent the Defense from raising a motion alleging a failure to state an offense outside the time period specified in his scheduling order, he had "other potential remedies available," such as "addressing the alleged conduct on the record during trial" and holding counsel in contempt.

At the outset of the first day of motions, and apparently without advance notice to the parties, the military judge explained on the record what had happened at the workshop. He characterized the episode as the Chief Trial Judge "inform[ing] the group that a defense counsel had specifically complained that a military judge had issued a scheduling order and provided an additional, more specific order requiring the defense counsel to disclose the details of a defense motion." The military judge went on to state on the record that he found "expressing dissatisfaction to the Chief Trial Judge regarding a specific ruling issued by a military judge" was "problematic, to say the least," as it "may impact that military judge's independent judicial decision-making process in that case or future cases." Discussing rulings by our court and our superior court, the military judge said that "the process for expressing displeasure with

the military judge's ruling" do not include "raising the complaint to that military judge's supervisor."[10] He also told the parties that "[e]xpressing dissatisfaction with the military judge's ruling in a specific case to that military judge's supervisor is strictly prohibited."[11]

The military judge went on to explain that "[s]uch conduct could call into question the military judge's decision to reconsider or not reconsider a particular motion issue out of fear of reprisal from his judicial supervisor" or, alternatively, "that the military judge's judicial independence is in question because a decision on a motion issue has been influenced by a supervisory judge." He said doing so "places the military judge in an undesirable position of having his impartiality called into question through no fault of his own because a counsel disagrees with a judicial decision and chooses to raise that concern with the military judge's direct supervisor." The military judge explained various options for counsel to address his rulings, ultimately advising them that "[c]ontacting the military judge's supervisor to express dissatisfaction with an adverse ruling in an ongoing case is not an appropriate remedy."

After providing the foregoing guidance, the military judge described the circuit defense counsel's comments at the workshop as "an unfortunate misstep on the part of counsel" but which were "immaterial on the merits of this case." He explained that at the time he learned of the comments, he had ruled and already drafted—but not yet provided to counsel—his written ruling on the scheduling-order matter. He noted the Chief Trial Judge had not sought to influence the court with respect to any rulings related to Appellant's trial. He told the parties he "ha[d] no concerns with his impartiality going forward and [was] confident that his fairness cannot be reasonably questioned" and that he "will not be improperly influence[d] by this particular matter." The military judge explained he raised the matter of the workshop out of his duty to ensure

---

[10] The military judge cited *United States v. Hutchinson*, No. ACM 38503, 2015 CCA LEXIS 269 (A.F. Ct. Crim. App. 29 Jun. 2015) (unpub. op.). That case, however, dealt with government attorneys contacting a judge's supervisor regarding the judge's scheduling decisions and whether, by doing so, the attorneys' conduct created the appearance of unlawful command influence.

[11] Although not entirely clear, the military judge seemed to derive this premise from *United States v. Ledbetter*, 2 M.J. 37 (C.M.A. 1976), a case which dealt with claims that The Judge Advocate General—not a defense counsel—improperly scrutinized a judge's sentencing decisions. In *Ledbetter*, the Court of Military Appeals held "official inquiries . . . which question or seek justification for a judge's decision" were barred "unless such inquiries are made by an independent judicial commission established in strict accordance" with a 1972 American Bar Association standard—a standard which no longer appears to exist.

the fairness of Appellant's trial as well as his concern for "absolute transparency with regard to an issue that has at least some potential to call into question the impartiality" of the court. The military judge then asked the parties if they had any questions or desired to challenge him, and circuit defense counsel answered: "No questions and no challenges."

The military judge proceeded to hear motions over the rest of the day and the next day, Friday, 23 August 2019, including a defense motion to compel the assistance of a computer analyst who could review data the Government had extracted from Appellant's cell phone. The Government had previously made a hard drive containing the extracted data available to the Defense, but trial defense counsel asserted they had no ability to access the contents of the drive, much less review the data. At some point after the court recessed on Friday, the military judge granted this motion and the analyst began his review. This analysis continued over the weekend with the Defense periodically providing newly discovered information to trial counsel.

On the morning of Monday, 26 August 2019, the military judge and the parties discussed proposed voir dire questions, and about ten minutes before the members were scheduled to be brought into the courtroom, trial defense counsel provided the military judge with 13 affidavits from people who had attended the advocacy workshop earlier in the month. In essence, the affidavits suggested Appellant's circuit defense counsel had not been referring to any particular case during the meeting with the Chief Trial Judge and that the comments were not so much a "complaint" as they were the catalyst for a discussion. Circuit defense counsel then asked to voir dire the military judge and to call the Chief Trial Judge as a witness "to determine if there's an attempt to create bias of the military judge, if the trial judge is biased against defense counsel, or if there's been [an] attempt made to chill the role of defense counsel in this case."

The military judge agreed to answer defense questions, and during the ensuing voir dire, he explained the Chief Trial Judge had never mentioned a particular counsel or a particular case, but he concluded the Chief Trial Judge was referring to Appellant's case and the detailed circuit trial counsel based upon what the Chief Trial Judge had said about the issue. The military judge further explained he felt obligated to disclose the fact the matter came up out of concern for the possible perception that he might be reviewing his decisions based upon comments made to his supervisor, even though the Chief Trial Judge had not told him to do or not do anything with respect to the court-martial. The military judge asserted he "will not be influenced by anybody" and that he "hold[s] absolutely no animus towards any counsel, ever," noting that he was "retirement eligible" and "not going to be a general officer."

The military judge did concede he might "get a little bit fired up when it comes to issues" and perhaps had been "hypersensitive" about circuit defense counsel's comments at the workshop and added, "in the future, I would love counsel, even in an academic setting, to not raise issues that are pending before any court." At one point, circuit defense counsel posed the following question:

> Noting that we sit in the same building when we're not on the road, and we never discuss ongoing cases in *ex parte* fashion. You've always had an open door to me. Our families have socialized at holiday parties. You've always invited me to sit down for conversations about the Air Force, about officership, and been a mentor to me in those things. Has any of that changed as a result of this?

The military judge answered, "No, I hope not. I hope not from your perspective." Circuit defense counsel then commented, "It hasn't."

After questioning the military judge for about 30 minutes, circuit defense counsel made an oral motion for the military judge to recuse himself from the court-martial. Circuit defense counsel essentially argued there was an appearance of unfairness based upon the military judge's concession of being "perhaps hypersensitive" and having concluded counsel had "complained" at the workshop, although circuit defense counsel also said, "I want to put on the record, based on the military judge's responses, and based on the affidavits, there appears to be no actual bias in this case."[12] The military judge verbally denied the motion, and the rest of the day was spent selecting court members. Once that process was complete, the members were told to report back at 0830 hours the following morning.

When the court convened the next day, Tuesday, 27 August 2019, the military judge placed his written decision on the recusal motion on the record. His ruling indicated he found that "no persuasive connection has been drawn between the military judge's raising on the record the manner in which a pending matter was addressed to the [Chief Trial Judge] and a reasonable inference of partiality."

### b. Opening Statement Slides

At 0830 hours, after placing his recusal ruling on the record, the military judge asked the parties if there were any other matters to take up before calling the members for opening statements. At that point, trial counsel told the military judge the Government had just received a copy of the slides that the Defense intended to use in their opening, and said those slides contained

---

[12] Circuit defense counsel did not renew his earlier request to have the Chief Trial Judge called to testify.

"screen shots of things that are not in evidence" such as text messages between [Ms. ES] and Appellant, which trial counsel asserted had not been previously disclosed to the Government. The military judge turned to trial defense counsel and said,

> Once again, [five] minutes after the time I told the members to be here that we would get started, I'm dealing with another last minute issue. I'm just—I'm curious defense. What did you think was going to happen when you presented these slides to the [G]overnment this morning? What did you think the outcome would be? . . . What did you think was going to happen? Did you think that we were going to just roll right into the court members or did you think that they might have a concern about some of the content to [sic] this?

Trial defense counsel confirmed the text messages in the slides had been discovered in their expert's analysis over the weekend of the data the Government had seized from Appellant's phone, leading the military judge to ask,

> Did we or did we not discuss two or three days ago when the court granted your expert to allow you to gain access to that extraction, that there might be some issues with regard to discovery? For example, if you found anything in there that certainly you intended to introduce at trial or use at trial, you had disclosure obligations to the [G]overnment under the discovery rules under [Rule for Courts-Martial (R.C.M.)] 701, right? It's not a one-way street. It's not they have to provide you with everything and then you get to come in seven [ ] minutes after we told the members to be here and say, "Here's some stuff that we found. We're just going to give it to you now." Do you understand that?[13]

---

[13] During the motions hearing regarding the Defense's motion to compel expert assistance, circuit trial counsel argued that if the Defense found "something on the phone that they wish to use, that will create additional discovery obligations" which could result in a trial delay. The military judged asked the Defense, "Have you contemplated the implications of what will likely happen through the course of the appointment of an expert[?] You go beyond the scope of what the [G]overnment searched in that extraction, what that means as far as your obligations under discovery and potentially your obligations to provide information to the United States [G]overnment that comes off of your client's phone?" Trial defense counsel replied, "Absolutely. That has been fully considered." The military judge then said, "They're going to want to look as deeply as you want to look. Do you understand that?" Trial defense counsel responded affirmatively.

After more discussion of the matter, the military judge said,

> All right. I've heard enough. Government, how much time do you need? I'll give you as much time as you need. I'm not going to operate this trial on the fly and do things because they just keep dropping in my lap. I haven't—I haven't offered recesses yet to deal with these surprise issues but now we're going to start doing it because I'm just not going to deal with these on the fly.

The court reconvened shortly before noon, and the military judge said the Defense had, in fact, complied with their discovery obligations regarding the text messages. However, he concluded the Defense's use of the text messages in the opening slides "would amount to publishing an exhibit to the court members before an evidentiary ruling can be provided," and that he felt it would be "improper" to show the members the messages "without any further instruction as to how the members can consider the specific messages." As a result, trial defense counsel removed the text messages from their slides and did not reference them in the Defense's opening statement.

### c. Mil. R. Evid. 412 Ruling and Opening Statements

The preceding Friday, the military judge had heard arguments on a defense motion to admit evidence under Mil. R. Evid. 412 related to Ms. KT, and he provided the parties a written ruling on Saturday.[14] One part of this motion was the Defense's request to be able to reference the specific number of times Appellant and Ms. KT allegedly had sex during their relatively short relationship, a number which we need not repeat here. The Defense's theory, as we understand it, was that Appellant and Ms. KT had rapidly escalated the intensity and intimacy of their relationship and were frequently engaged in sexual activity such that Appellant may have had a valid mistake of fact defense as to Ms. KT's consent during the assault. An alternative defense theory was that Ms. KT was unnerved by the speed of the relationship—in which she and Appellant were discussing marriage by their second weekend together—and she falsely claimed she had been assaulted in order to extricate herself from the relationship.[15] Trial counsel specifically objected to the admission of this evidence, arguing that the number of times the two had sex was irrelevant and it

---

[14] The pretrial motions and the transcript of the related hearing were sealed by the military judge. This opinion contains discussion of sealed material only as necessary for our analysis.

[15] This theory also relied on the fact Ms. KT and Appellant bought an emergency contraceptive for Ms. KT to use before she returned home at the end of the second weekend. The Defense sought to characterize this as a "pregnancy scare." Ms. KT described

was being offered simply to paint Ms. KT as being promiscuous.[16] Ms. KT's special victims' counsel said he thought it was "completely fair" for the Defense to "ask if it was multiple times or if it was more than one time," but noted Ms. KT did not agree with the number the Defense proposed.[17] In his written ruling, the military judge ruled that the Defense *could* present evidence regarding the specific number of times the Defense alleged Appellant and Ms. KT had sex because—according to the military judge—there had been no objection from either trial counsel or the special victims' counsel.[18] The military judge ruled the Defense *could not* present evidence either that Appellant and Ms. KT talked about having sex before they met or that they had sexual intercourse just a few hours after they did meet.

The Defense also made a motion to admit evidence under Mil. R. Evid. 412 regarding Ms. ES, Appellant's ex-wife. The military judge's ruling on that motion permitted trial defense counsel to admit evidence that Ms. ES and Appellant had been in a sexual relationship for five years, but prohibited eliciting "testimony regarding the frequency of intercourse or specific sexual acts."

In the Defense's opening statement, trial defense counsel began explaining the origins of Appellant's relationship with Ms. KT, telling the members, "They immediately start moving from [an online dating application] to talking on text message and things ramp up and intensify, intensify considerably very quickly. They get to know each other with a deep, personal, intimate level and no topic

---

it as a precautionary measure following the assault, because Appellant had not worn a condom.

[16] Trial counsel's written response to the Defense's motion was more ambiguous on this point; they wrote: "The Government has no objection to the admission of evidence that [Appellant] and [Ms. KT] had consensual sex before the charged incident. That said, detailed testimony as to the frequency of the pre-assault consensual sex or an implication that it formed the whole basis of the relationship quickly risks running afoul of [Mil. R. Evid.] 412 and [Mil. R. Evid.] 403." The written motion did not address the specific number of times the two had sex that trial defense counsel alleged in their Mil. R. Evid. 412 motion.

[17] However, Ms. KT's special victims' counsel's written response said Ms. KT "does not object" to admission of evidence that she and Appellant had sex the specific number of times alleged by the Defense.

[18] In paragraph 27 of the military judge's ruling, he wrote that "the Defense identified the following matters for admission . . . (e) Between on or about 17 Aug and 27 Aug 2018 [Ms. KT] and [Appellant] had consensual sex approximately [X] times." Immediately following the heading of "Admissible Without Objection," paragraph 28 states the information in paragraph 27(e) is admissible based on the absence of objection from the Government and based on the information being "relevant to the issues of consent or mistake of fact as to consent . . . and may be constitutionally required."

is off conversation." Trial counsel objected, saying, "[w]e have litigated this issue," and the military judge sustained the objection, telling the members to disregard trial defense counsel's "last statement." Moments later, trial defense counsel told the members about the first weekend Ms. KT spent with Appellant: "They go out on the town, they're drinking, they go to coffee shops, he shows her Spokane, and they have consensual sex on multiple occasions the first week." Trial counsel objected again, saying, "We have litigated this issue. Your ruling was clear." As a result, the military judge excused the members and convened an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session outside their presence. This session was closed to spectators other than the parties, Ms. KT, and Ms. KT's special victims' counsel.

In the session, trial counsel re-raised the first objection and said, "I don't know what exactly the defense counsel was trying to do. If he's trying to pull something over the [c]ourt; if he's trying to infer something; if it's bad faith; or just bad lawyering." Trial counsel further indicated the Government might need to evaluate whether new members would be required if the Defense "continue[d] to flaunt" the military judge's ruling. Trial counsel argued that by saying "no topic is off conversation," the Defense had violated the military judge's ruling regarding how soon Appellant and Ms. KT first had sex. Regarding the second objection, trial counsel pointed to the military judge's ruling prohibiting evidence of Appellant's and Ms. KT's pre-meeting discussions about having sex.[19] This led the military judge to turn to the Defense and say,

> Okay. Defense, so we had pretty extensive motions practice under [Mil. R. Evid.] 412, I've given you an 11-page ruling that was pretty detailed—I thought—with regards the left and rights, with regards to what you could and couldn't get into. I'm being as patient as I can with these types of issues that keep sort of popping up as if there's no recollection of the discussions that we've had in the past on these types of issues.

The military judge next incorrectly asserted the Defense had told the members Appellant and Ms. KT had sex just a few hours after meeting and claimed the Defense had also violated the ruling regarding Appellant and Ms. KT talking about having sex before they had met. He asked trial defense counsel, "Why are you talking about that in light of the [c]ourt's ruling on [Mil. R. Evid.] 412?" Trial defense counsel denied he made either of those statements and argued the opening statement had been consistent with the military judge's ruling. The military judge responded,

---

[19] We presume trial counsel unintentionally reversed which part of the military judge's ruling pertained to which objection.

What are you implying there with regard to "all topics, nothing was off-limits?" Do you mean baseball, weekends in the park? What are you talking about when you say—what's the implication that you're trying to lead with the court members when you say, before they met, they talked about all topics. Nothing was off-limits. Because, you know, we are all adults here, right? What was the implication of that? What are you trying to imply?

The Defense explained they were trying to show how quickly the relationship between Appellant and Ms. KT formed, describing that as "an incredibly crucial component to this case." The military judge said,

I'm just trying to—I don't want to believe that you're just being clever and that you're going to scrape up against the line from an implication standpoint, sort of "wink-wink, nod-nod,[ ] hey members, they talked about everything. All topics were on the table.["] I'm hoping you're not doing that. I really want to believe that that's not what's going here. [sic] But I share the [G]overnment's concern because in a matter such as this, when I've already ruled on the issue, when counsel sort of try to push the envelope on an issue that I've already ruled on to the point where I'm concerned it's going to leave an impression with the members, that causes me concern because I've already ruled on it. And now it's—I don't even need his objection because I've ruled on something and somebody goes against that ruling, well I kind of wonder what happened to the part where I ruled on it. Do people not care what my rulings are if they're going to sort of go around them?

The military judge turned to the objection regarding the Defense's statement that Appellant and Ms. KT had sex on multiple occasions, and he stated on the record that he would take a moment to read his written ruling. The military judge paused and then announced, "Okay, listen. I'm going to overrule the second objection." This led trial counsel to say that the Government and the Defense seemed to have "a fundamental misunderstanding" about the ruling, and that trial counsel were not asking for the military judge to reconsider his ruling, but that they would like to ask for "additional guidance or a supplemental ruling" regarding sexual conduct between Appellant and Ms. KT. In explaining this "misunderstanding," trial counsel pointed to the ruling regarding Ms. ES in which the Defense was prohibited from eliciting the "frequency of intercourse" between Ms. ES and Appellant.

The military judge then embarked on a lengthy explanation about how an existing sexual relationship—but not necessarily specific details of the rela-

tionship—is relevant to the issue of mistake of fact as to consent. He acknowledged his ruling did permit the Defense to elicit the number of times Appellant and Ms. KT had sex and then—somewhat mid-stream—he said, "consider this a reconsideration of the ruling to provide a little bit more clarity," and "[t]o the extent that is in-artfully drafted, consider it artfully drafted at this point forward." He then said that "no questions, no testimony, no statements regarding frequency or any implication that Ms. [KT] is a promiscuous person sexually" would be permitted. He said that although his ruling had permitted the Defense to elicit the number of times Appellant and Ms. KT had sex, he did not intend to permit an "inference that frequency of sex mattered, if that makes sense."

Before concluding the Article 39(a), UCMJ, session, the military judge said he was sustaining both of the Government's objections, in spite of his earlier ruling. However, when the members returned to the courtroom, the military judge neglected to inform them what his ruling was on the second objection.

### d. Examination of Witnesses

As discussed in greater detail below in Section II.B. of this opinion, *infra*, Ms. KT declined the Defense's requests for a pretrial interview. As a result, trial defense counsel periodically indicated during trial that they were surprised by portions of her testimony. At one point during her direct examination, trial counsel elicited that the morning after the assault, Appellant attempted to initiate sexual conduct again, and Ms. KT told him "no." Trial defense counsel objected based on lack of notice and the military judge sustained the objection. Despite having objected to this evidence, circuit defense counsel elicited the exact same evidence during his cross-examination of Ms. KT and obtained her agreement that when she told Appellant "no" on this occasion, Appellant "just respected [her]." After five questions and answers on the topic, trial counsel said, "Your Honor, I understood that the [G]overnment was precluded from asking these questions." The following colloquy ensued in front of the members:

> MJ [military judge]: Yeah, I don't understand. I sustained an objection, didn't I?
>
> CDC [circuit defense counsel]: It was very important to the members, Your Honor, so I think—
>
> MJ: No it wasn't. When I sustain an objection that means it's not before the members. That means I sustained the objection. It means to disregard the question and the answer. Did I not sustain an objection on that issue?
>
> CDC: You . . . You—I agree. So, Your Honor,—understand. So I'm asking about now as [sic] something I just learned about as

16

> part of my expanded cross and having not had the opportunity to interview this witness.
>
> MJ: Well, this is no surprise because you heard it in the direct examination and then you objected to it and I sustained the objection.
>
> CDC: Yes. So I think it's fair game to talk about it—and this is by which [sic] I discovered it. I'm hearing her say it for the first time. And so had I known about it before certainly would have wanted to ask.

This led the military judge to move the discussion into an Article 39(a), UCMJ, session outside the members' presence at the end of which the military judge called the members back in and told them he had overruled the objection. Trial defense counsel then proceeded to ask Ms. KT about her telling Appellant "no" that morning after the assault and how Appellant respected her wishes.

Appellant contrasts this reaction by the military judge with an objection raised by the Defense during Ms. ES's direct testimony after trial counsel asked her if she had "made any additional allegations against [Appellant] to try to get back at him for some reason." Ms. ES answered, "No. I have not," and trial defense counsel objected. In the Article 39(a), UCMJ, session that followed, trial defense counsel reminded the military judge that he had denied the Defense's pretrial motion to be allowed to elicit evidence that Ms. ES *had* accused Appellant of other sexual offenses—most of which the Government had not charged Appellant with. Regarding one offense the Government had charged Appellant with, Ms. ES apparently admitted the sexual conduct in question was, in fact, consensual, and the Government withdrew that specification before trial. Thus, trial defense counsel argued, the Government had violated the ruling—or at least created a situation wherein the only way the Defense could rebut Ms. ES's claim of not making any other allegations was to cross-examine her on matters the military judge had disallowed. After a lengthy discussion, the military judge overruled the Defense's objection and refused the Defense's request for permission to question Ms. ES on the matter.

The military judge explained his ruling on the objection as being for Appellant's benefit, insofar as it would avoid suggesting to the members that Ms. ES had, in fact, made other allegations against Appellant. Turning to trial counsel, the military judge cautioned them to "tread lightly" and to "be more careful than ever that you don't ask certain trigger questions that trigger discussions about things that this [c]ourt's already ruled on. Okay?" When the members returned to the courtroom, the military judge failed to tell them he had overruled the Defense's objection.

Appellant also highlights that, during the Defense's cross-examination of Ms. KT, the military judge interrupted the questioning when Ms. KT and trial defense counsel began talking over each other. The military judge told trial defense counsel to "stop it," and that if it happened again he would convene an Article 39(a), UCMJ, session and "do some other remedies." The military judge then told trial defense counsel, "If you need to count to five—whatever trick you need to do to allow her to finish her answer, do it."

During the direct examination of another witness, the Government offered as an exhibit one page of phone records, a large portion of which had been redacted. Circuit defense counsel objected, explaining that he wished to have the option to question the witness about some of the obscured calls. After some discussion, the military judge convened an Article 39(a), UCMJ, session. Circuit defense counsel attempted to explain why he thought some of the blacked-out information was relevant, leading the military judge to apologize if it appeared that he was "getting frustrated" because he did not understand the Defense's argument as to the relevance. The following colloquy then occurred:

> MJ: Okay. Do you have a copy of this prepared that's un-redacted?
>
> CDC: Not prepared because—
>
> MJ: When did you get this?
>
> CDC: I've had that for weeks, Your Honor.
>
> MJ: You've had that for weeks, and you don't have a copy that's un-redacted?
>
> CDC: Not printed with me.
>
> MJ: Did you anticipate an objection when they gave this to you weeks ago and you thought they might use it and you didn't anticipate an objection weeks ago? You just anticipated it right now?
>
> CDC: I've never seen it in that form before right now.
>
> MJ: Hold on, you just told me you had this. Did you have this? I asked you if you had this.
>
> CDC: Oh, no. I'm seeing it for the first time a few minutes ago. Sorry.
>
> MJ: Okay. So you don't have—you didn't have the redacted version of this? When did you get the redacted version of this?
>
> CDC: It was as it arrived on my table today.

CTC [circuit trial counsel]: Your Honor—and I'm sorry to interrupt the [D]efense—I will take responsibility for not ensuring that this had been provided to the [D]efense. To the extent that there was a notice issue, I will take responsibility for that, Your Honor.

In the end, the military judge overruled the Defense's objection, telling trial defense counsel that they could offer their own version of the call log into evidence if they felt such was warranted.

### e. Revisiting the Military Judge's Mil. R. Evid. 412 Ruling

Once the Government rested, the military judge convened an Article 39(a), UCMJ, session outside the presence of the members in order to hear several matters the Defense wished to raise, the first of which the Defense asserted was "just in an effort to protect the record for both the [G]overnment and the [D]efense." Trial defense counsel pointed to trial counsel's "bad lawyering" comment as accusing the Defense of providing Appellant with ineffective assistance and asked the military judge for "a finding of fact that no such ineffective assistance of counsel happened" based upon the Defense's adherence to the military judge's written ruling regarding Ms. KT.

In response, the military judge said he would "state a couple things for the record, sort of unscripted and unprepared kind of off the top of [his] head." The military judge then described litigation as a "contentious" and "emotional" process in which "things often get heated." He noted that "[c]ounsel are sometimes more well-behaved than old judges when it comes to keeping their cool" and "that sometimes we all say things or do things that we would like to grab back . . . particularly in the sort of heat of battle for lack of a better phrase." The military judge said courts and parties "tend to be . . . particularly sensitive" about matters related to Mil. R. Evid. 412 and that he knows "it's particularly difficult for counsel, [three] or [four] days later in the trial to kind of remember the left and rights of any particular given ruling."

The military judge conceded his written ruling had contained

at least one finding of fact that made a specific reference to the number of instances. . . . But the [c]ourt recognized that while it wasn't the intention of the court, one implication might be that that might open the door to issues such as frequency, et cetera, regarding prior sexual behavior, which was specifically not something that the court was permitting to get into based on the state of the law.

. . . .

19

> So certainly once the [c]ourt recognized the inclusion of that particular reference certainly did provide at least some indication that at least discussing frequency or numbers, or however you want to characterize it, was somewhat on the table, I think we went through that, we clarified that, that frequency wasn't on the table, and we moved on from there.

Addressing trial counsel's "bad lawyering" comment, the military judge described it as "a momentary lapse of hyperbole, an emotion based on a contentious issue" and not "a formal allegation against the defense of being ineffective." The military judge went on to say he had not seen anything in the court-martial "remotely close to ineffective assistance," that he had "zero concerns with the quality of the defense services that have been provided to [Appellant]," and that trial defense counsel "very zealously" represented Appellant. He then said, "[S]o that it's clear for the record, regardless of any frustration or intemperate comments that may have come from any source in this courtroom, the court is absolutely convinced that ineffective assistance of counsel is not a concern."

### f. Closing Argument Slides

Just before giving the Government's closing argument, while the members were present in the courtroom, circuit trial counsel said he would mark a copy of the slides he intended to use as an appellate exhibit, to which circuit defense counsel said, "I have not seen them Your Honor, but if there is a printed copy, I can give it a 30 second flip." The military judge asked trial counsel if they had a copy for the Defense, but trial counsel said they did not. It is unclear from the record what happened next in the courtroom, but circuit defense counsel announced "no objection," and trial counsel proceeded with closing argument.

### g. Motion for Mistrial

The members announced their verdict in the evening of 29 August 2019. The next morning, the Defense asked the military judge to declare a mistrial under R.C.M. 915. The Defense advanced two grounds: (1) inadequate notice with respect to the specification alleging an attempted sexual assault on Ms. ES (and relatedly, a perceived incongruity between a conviction for that offense and an acquittal for abusive sexual contact arising out of the same conduct), discussed in greater detail in Section II.D., *infra*; and (2) disparate treatment of the parties by the military judge. With respect to the second ground, trial defense counsel asserted there were "countless examples" of such disparate treatment, but they specifically referred to three instances they believed supported their argument: (1) discovery related to opening and closing slides; (2) objections to the Defense's opening statement regarding the military judge's

Mil. R. Evid. 412 ruling; and (3) selective enforcement of the military judge's scheduling order.

As to the Defense's opening-statement slides, trial defense counsel said the military judge had "admonished" the defense team "for ambushing the trial counsel by surprise" and granted "a substantial three to four hour delay" in the court-martial. Conversely, trial defense counsel argued that just before closing argument, "trial counsel in live real time before the members went to start argument and play his PowerPoint slides through the computer without providing any notice to the defense counsel about what was in those slides and . . . what it may have contained." The Defense argued the military judge "did not treat that act in the same way [towards the Government] that the [D]efense absorbed admonishment" with respect to the Defense's opening slides. Responding to this claim, the military judge drew a couple distinctions, noting that the Defense's slides contained matters which "were part of the discovery issue" and that trial defense counsel said they had no objection to the Government's closing slides. The military judge also contended he "didn't admonish anybody in front of the members," although he conceded he "might have given [trial defense counsel] a little bit of a hard time."

Regarding the military judge's Mil. R. Evid. 412 ruling during the Defense's opening statement, trial defense counsel said trial counsel's objections resulted in "a considerable delay within the opening statement." Moreover, trial defense counsel argued, once the military judge realized the Defense had not, in fact, violated his ruling, the military judge still "strictly cautioned defense counsel from using surreptitious language that could connote the underlying prohibited conduct from the [Mil. R. Evid.] 412 ruling." Trial defense counsel then pointed to the re-direct examination of Ms. ES in which trial counsel asked about matters which the military judge had prohibited the parties from raising. Trial defense counsel said the military judge's reaction "was in stark contrast to how it was dealt with just a couple of days earlier."

With respect to the scheduling order, trial defense counsel argued trial counsel filed nearly all of their motions late and submitted their proposed voir dire questions on the first day of trial, none of which gave the military judge "any concern." Yet, when the Defense sought relief from the scheduling order, trial defense counsel claimed the military judge told them to consider the order "as a direct order from the court and from a superior commissioned officer to not violate it."[20] The military judge said the reason he denied the Defense's request was because he did not want to "let one side create a strategic advantage over the other." He continued:

---

[20] We are unable to locate in the record any instance of the military judge saying this.

> I mean, if we want to re-litigate that motion then the truth of the matter is what you wanted to do was file a motion late because you mistakenly believed that they would be foreclosed from fixing an offense that failed to state an offense. It didn't[,] but you believed they would be foreclosed from fixing that offense and that you would therefore gain a tactical advantage. . . . I don't know where you all are getting this notion that you're being tactically disadvantaged by filing—by not being allowed to file a motion at the last minute. . . . [T]here's lots of things that didn't happen in this case that were not consistent with my scheduling order from both sides because I didn't enforce it the way I probably should have and maybe I will better in the future. But the denial was not based on preference. It was based on what you wanted to do in your motion. In my firm belief that it was going to be negative towards [Appellant] that he was going to face[—]potentially face a second trial.

Although trial defense counsel did not specifically allege the military judge was biased against the Defense, they did focus their argument on the claimed disparate treatment of the parties. The military judge reframed their argument: "I believe what you're essentially articulating is that the military judge should recuse himself because of bias." He said the court would recess and gave the Defense an hour to brief the issue in writing, saying, "I think there's factual distinctions between the issues that you raised but in any event I'm not inclined to put myself in a position where I have to constantly defend myself against allegations that I'm biased." Trial defense counsel subsequently submitted a written motion for a mistrial in which they stated:

> In isolation, no decision or ruling by the Court would ever come close to requiring such mistrial, but the pervasive nature of such rulings over a two week litigated trial, in context with the issue put substantial doubt in the eyes of any reviewing authority or member of the public watching this trial.

Citing R.C.M. 915, the Defense further argued that "[s]ubstantial disparate treatment between the parties is evident throughout the entire recording [sic] of trial," that "no amount of curative instructions could cure the irreparable harm of continued adverse ruling and admonishments to defense counsel in a way that so starkly contrasts how the trial counsel was treated in open court," and "[t]his suggests bias in a way that for the integrity of the military justice system, this case should be declared a mistrial."

In his written ruling, the military judge found as an "essential finding[ ] of fact" that he did not take any remedial action against the Government for their late filings "[b]ecause the Defense never raised any objections to the Court's

consideration of the Government [sic] late responses until today nor articulated any prejudice because of the Government's failures." With respect to the text messages the Defense wished to refer to in their opening statement slides, the military judge found as fact that "[n]o negative action was taken by the Court towards the Defense in response to this issue, other than addressing the matter on the record," and that he sustained the Government's objection to the slides "as it amounted to publishing exhibits to the members that were not yet admitted into evidence." The military judge ruled that he "remain[ed] unconvinced that a reasonable person knowing all the circumstances—including the various court rulings in this case that have been favorable to the Defense . . . would harbor doubt as to the Court's impartiality." The judge continued,

> [T]his [c]ourt has granted several requests for reconsideration, has allowed for expanded argument on issues raised to include multiple additional argument on the same issue, has not precluded the Defense from raising any matter despite timeliness concerns, and has considered oral motions on potentially case or offense dispositive issues raised without written filings or accompanying legal authority.

He concluded that while some matters "and the manner in which they are raised" may "generate heated discussions," the exchanges in Appellant's trial were not so "extraordinary" that they called for either recusal or a mistrial.

The military judge ruled that the Defense had not "identified any particular ruling that indicated bias on the part of the Court," or shown that trial defense counsel were precluded from presenting any evidence or raising any objections due to timeliness concerns. He also ruled the Defense had not identified any examples of him doing something that could be perceived as assisting the Government "outside of citing anecdotal examples of interactions with counsel that the Defense argues differed in tone between the Defense and the Government, without acknowledging the context surrounding those various interactions." The military judge noted that "at no time during the course of this trial did [he] make any statement expressing concern or frustration with counsel and the manner in which they were presenting their case in front of the court members." He also pointed to his instruction to the members that they were to disregard any comment or expression suggesting his opinion as to Appellant's guilt.

### h. Clemency Submission Addressing Military Judge Bias

The Defense reiterated its complaint that the military judge demonstrated both implied and actual bias in a clemency submission written by trial defense counsel. In that submission, trial defense counsel contended that when the mil-

itary judge denied the Defense's motion for recusal, "[t]here was an uncomfortable tension in the air, based on the language, tone, body language, and facial expressions of the military judge. All in the room could observe it. Several in the gallery commented on it after the trial." Trial defense counsel argued the Defense "lost" nearly every motion submitted to the military judge and "lost objection after objection." Trial defense counsel also reiterated that the Defense's argument for recusal was based on public perception of the proceedings, and the argument for mistrial was additionally based on a claim of the military judge's actual bias against the Defense.

### *i. Post-Trial Matters Presented for Our Consideration*

Once this case was docketed with this court, Appellant again asserted the military judge was personally biased against circuit defense counsel. In support of this contention, Appellant moved to attach a portion of a transcript from another court-martial featuring the same military judge and circuit defense counsel in which the military judge, *inter alia*, threatened circuit defense counsel with contempt proceedings for not following the military judge's directions. Appellant argues we should overlook the fact that the prior proceeding was not raised as evidence of bias at his court-martial under the theory that circuit defense counsel was not responsible for post-trial processing in the prior case, and—as a result—circuit defense counsel "would not have [had] access" to the transcript of the prior case.

### 2. Law

### *a. Recusal of a Military Judge*

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (first citing *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); and then citing *Tumey v. Ohio*, 273 U.S. 510 (1927)). The validity of the court-martial system "depends on the impartiality of military judges in fact and in appearance." *Hasan v. Gross*, 71 M.J. 416, 419 (C.A.A.F. 2012). Under R.C.M. 902(a), "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Moreover, a military judge is required to disqualify himself or herself if "the military judge has a personal bias or prejudice concerning a party." R.C.M. 902(b)(1). Military judges "should broadly construe grounds for challenge but should not step down from a case unnecessarily." R.C.M. 902(d)(1), Discussion. A motion to disqualify a military judge "may be raised at any time, and an earlier adverse ruling does not bar later consideration of the same issue, as, for example, when additional evidence is discovered." *Id*.

When considering a challenge based on the appearance of bias under R.C.M. 902(a), we review the matter under an objective standard, "asking

whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (citing *Hasan*, 71 M.J. at 418). Once a military judge's impartiality is challenged, we ask whether the "court-martial's legality, fairness, and impartiality were put into doubt by the military judge's actions," taking the trial as a whole. *United States v. Foster*, 64 M.J. 331, 333 (C.A.A.F. 2007) (quoting *United States v. Quintanilla*, 56 M.J. 37, 78 (C.A.A.F. 2001)). Recusal in such cases "is intended to 'promote public confidence in the integrity of the judicial process.'" *Hasan*, 71 M.J. at 418 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n.7 (1988)).

We recognize "a strong presumption that a judge is impartial," as well as the premise that "a party seeking to demonstrate bias must overcome a high hurdle." *Quintanilla*, 56 M.J. at 44 (citation omitted). When a military judge disclaims partiality, such a disclaimer "carries great weight." *United States v. Harvey*, 67 M.J. 758, 764 (A.F. Ct. Crim. App. 2009) (citing *Foster*, 64 M.J. at 333) (additional citations omitted). Rulings and comments made by a judge "do not constitute bias or partiality, 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Quintanilla*, 56 M.J. at 44 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)).

We review a military judge's decision on a recusal motion for abuse of discretion. *United States v. McIlwain*, 66 M.J. 312, 314 (C.A.A.F. 2008) (citation omitted).[21] Such a decision amounts to an abuse of discretion "if it is 'arbitrary, fanciful, clearly unreasonable or clearly erroneous,' not if [the reviewing court] merely would reach a different conclusion." *Sullivan*, 74 M.J. at 453 (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)).

If we conclude a military judge has abused his or her discretion in denying a recusal motion, we determine whether to reverse a conviction by reviewing the factors established by the Supreme Court in *Liljeberg*. *United States v. Uribe*, 80 M.J. 442, 449 (C.A.A.F. 2021) (citing *United States v. Martinez*, 70 M.J. 154, 159 (C.A.A.F. 2011)). These factors are: (1) what injustice was personally suffered by the appellant; (2) whether granting relief would foster more careful examination of possible disqualification grounds and their prompt disclosure; and (3) whether the circumstances of the case at hand would "risk undermining the public's confidence in the military justice system" when viewed through an objective lens. *Id.* (quoting *Martinez*, 70 M.J. at 159).

---

[21] Our superior court, the United States Court of Appeals for the Armed Forces, has specifically rejected the de novo standard for judicial recusal decisions. *United States v. Butcher*, 56 M.J. 87, 90–91 (C.A.A.F. 2001).

### *b. Consideration of Matters Outside the Record*

In conducting a review under Article 66, UCMJ, 10 U.S.C. § 866, military Courts of Criminal Appeals are generally limited to considering the "entire record," which includes the record of trial, allied papers, and briefs and arguments presented by appellate counsel addressing matters found in either the record of trial or allied papers. *United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020). One exception to this rule covers matters submitted for the first time on appeal regarding issues "raised by materials in the record but not fully resolvable by those materials." *Id.* at 445.

### 3. Analysis

### *a. Post-Trial Matters Presented for Our Consideration*

We begin our analysis by declining to consider the portion of the earlier trial's transcript submitted by Appellant as evidence of a claimed bias of the military judge against circuit defense counsel. Appellant's defense team thoroughly litigated the issue of the military judge's participation in Appellant's court-martial from their pretrial recusal motion through their post-findings mistrial motion and clemency submission. In the Defense's initial recusal motion, trial defense counsel focused solely on the appearance of bias, specifically stating, "there appears to be no actual bias in this case." By the time of the mistrial motion, trial defense counsel had broadened their argument to include actual bias against the Defense, but even then, the claimed bias was towards the Defense generally, not against circuit defense counsel himself.

We also find unavailing Appellant's claim on appeal that circuit defense counsel did not raise personal bias—as supported by portions of a transcript from proceedings in the prior court-martial—because this counsel was not responsible for handling Appellant's representation for that court-martial's post-trial processing. Whether or not circuit defense counsel possessed his own copy of the transcript from those earlier proceedings, he was indisputably present at those proceedings and therefore had personal knowledge of his interactions with the military judge. We see nothing in the record indicating circuit defense counsel intended to make a claim of personal bias, much less that he did not raise the matter because he had tried to obtain and was somehow denied access to a copy of the earlier proceedings. Given his statement disavowing any actual bias on the military judge's part, we think the more correct assessment is that circuit defense counsel chose not to claim the military judge was personally biased against him, and—by extension—elected not to support such a claim with evidence derived from other courts-martial.

We acknowledge the matter of the appearance of the military judge's fairness was called into question by the Defense, but that argument was never premised on the military judge's interaction with circuit defense counsel in

other cases. Appellant may not raise this new theory for the first time on appeal. *See, e.g.*, *United States v. Carpenter*, 77 M.J. 285, 289 (C.A.A.F. 2018) (noting that appellate review of a motion is limited to the motion submitted to military judge at trial, not the motion which appellate counsel wished had been submitted).[22] By disavowing the claim of personal bias at trial, we conclude Appellant not only failed to raise this argument, but that he has waived it for purposes of appellate review. Although we have authority under Article 66, UCMJ, 10 U.S.C. § 866, to pierce an appellant's trial waiver in order to correct a legal error, we decline to do so here. *See United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018). In any event, the fact this matter was not raised in the record means Appellant may not now supplement the record with transcript excerpts from unrelated proceedings under *Jessie*.

### b. Recusal

On appeal, Appellant argues the military judge should have recused himself due to "actual bias and/or appearance of partiality" in order to "ensure public confidence in the judicial process." While many aspects of the interaction between the military judge and trial defense counsel may be subject to valid criticism, we conclude the record does not support a conclusion the military judge abused his discretion in not recusing himself.

In their original recusal motion, trial defense counsel essentially disclaimed any actual bias on the military judge's part. That, as explained above, changed by the time the Defense moved for a mistrial, and Appellant's actual-bias argument is not entirely without basis. The record contains several instances where the military judge was squarely confrontational with trial defense counsel. One example was when the military judge admonished the Defense for disclosing text messages Monday morning that they discovered over the weekend—when the military judge had only granted the Defense's request for expert assistance to look for the messages the preceding Friday. The military judge's language speaks to his frustration, as he chastised the Defense for "another last minute issue," asking them "[d]id we or did we not discuss" the matter and "[w]hat did you think was going to happen?" while complaining that issues "keep dropping in my lap."

The military judge was also quick to lecture the Defense about following his rulings, asking rhetorically at one point, "Do people not care what my rulings are if they're going to sort of go around them?" This question, of course,

---

[22] Having carefully reviewed the record in this case, we see no indication the theory Appellant now seeks to advance on appeal was apparent from the claims he made at trial. *See United States v. Toy*, 65 M.J. 405, 409 (C.A.A.F. 2008) (concluding an alleged error—while not raised at trial—was "apparent from the context" of an issue that was raised, and was therefore arguably preserved for appeal).

came in the middle of a longer critique of the Defense which had been initially spurred by the military judge's erroneous recollection of his own written Mil. R. Evid. 412 ruling. Rather than admit his error, the military judge suggested the ruling was just "inartfully drafted," *sua sponte* reconsidered the ruling "to provide a little bit more clarity," and sustained two of the Government's objections to the Defense's opening statement—even though that opening statement fell within the bounds of the military judge's original ruling. In the midst of Ms. KT's cross-examination, the military judge lectured the Defense on the meaning of an objection being sustained and asked, "Did I not sustain an objection on that issue?" Yet, once an Article 39(a), UCMJ, session was convened and emotions seemed to have calmed, the military judge ruled in the Defense's favor. During another Article 39(a), UCMJ, session, however, the military judge essentially cross-examined trial defense counsel about why they did not have an unredacted copy of phone records on hand—an interrogation that only ended when trial counsel interjected and told the military judge they were to blame for not having earlier provided the Defense with the document trial counsel wished to admit.

Government counsel, on the other hand, largely escaped unscathed. For example, when trial counsel suggested trial defense counsel had engaged in "bad lawyering"—a comment flowing from trial counsel's incorrect recollection of the military judge's written Mil. R. Evid. 412 ruling—the military judge charitably referred to the comment as "a momentary lapse of hyperbole, an emotion based on a contentious issue." When trial counsel defied the military judge's ruling prohibiting evidence of Ms. ES's prior allegations of sexual assault, the military judge not only allowed Ms. ES's arguably false answer to stand, but he simply told trial counsel to "tread lightly" and "be more careful than ever."

We are nonetheless mindful that "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. The question is whether those remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* We find the matter of the training workshop telling in this case. The military judge's lengthy and sharp on-the-record critique of circuit defense counsel, punctuated by invocations of questionable—if not entirely inapplicable—legal standards, seems far out of proportion to the scale of the perceived "misstep" at issue. When the Defense re-raised the matter, the military judge conceded he might have been "a little bit fired up" and "hypersensitive" about the events at the workshop. This paints a picture not of a military judge who harbored a bias against the Defense, but instead of one who was acting somewhat impulsively on occasion rather than in the calm, temperate manner judges aspire to. Based upon our review of the record, we see scant support for the claim that

the military judge was actually biased against the Defense, and we will not conclude the military judge erred in not recusing himself on that ground.

The closer question is whether or not there was an appearance of bias— that is, whether the military judge's impartiality might reasonably be questioned. In his ruling on the mistrial motion, the military judge claimed he had not made any statement expressing concern or frustration with counsel nor had he admonished them in front of the court members. Even if this statement were accurate, this is not the standard for determining a judge's impartiality. The correct standard is "whether a reasonable person *knowing all the circumstances*" would question the military judge's impartiality. *Sullivan*, 74 M.J. at 453 (emphasis added). Thus, we consider the military judge's words and actions regardless of whether they occurred before the court members or even in the courtroom at all. This is so because the appearance of fairness is tied to the public's confidence in our judicial system, a concern that reaches far beyond the deliberation room in Appellant's court-martial.

Considering all the circumstances present in this case, we conclude the military judge did not abuse his discretion in not recusing himself, even under an "appearance of bias" standard. We arrive at this conclusion based on the fact that, notwithstanding caustic comments directed at trial defense counsel, the military judge's conduct raised more questions about his patience than his partiality. For example, the military judge seemingly assumed the worst with respect to the events of the workshop and decided to suggest on the record that the circuit defense counsel had committed professional misconduct, rather than discuss the matter in an off-the-record R.C.M. 802 conference and provide more tailored commentary in open court. However, once the Defense re-raised the issue with the military judge, his demeanor changed, and he admitted he had perhaps been "hypersensitive" about the matter. Similarly, when trial counsel objected during the Defense's opening statement, the military judge initially insinuated that trial defense counsel had intentionally flouted his ruling. When he revisited the matter, the military judge commended trial defense counsel for "very zealously" representing Appellant. That being said, the military judge also minimized trial counsel's "bad lawyering" comment as "a momentary lapse of hyperbole," when it was trial counsel's misreading of the military judge's written ruling and ensuing objection that gave rise to the lengthy excusal of the members in the middle of the Defense's opening statement in the first place.

Other aspects of the military judge's treatment of the Defense do give us pause. For example, the military judge's summary conclusion that trial defense counsel were prohibited from showing text messages to the members during the Defense's opening statement was seemingly untethered to the basis of the Government's objection, even if within the military judge's discretion. Notably,

the exchange over this issue—in which the military judge complained of "another last minute issue"—occurred just after the military judge issued his ruling on the Defense's motion for his recusal. Later, when the Government elicited Ms. ES's arguably false claim that she had not made any other allegations against Appellant—a matter which was the subject of a pretrial ruling adverse to the Defense—the military judge not only did not rebuke trial counsel, but he prohibited the Defense from challenging Ms. ES on that point. The military judge said he based this conclusion on his view that such a challenge would work to Appellant's disadvantage. While one could chalk these instances up to debatable decisions, one could also legitimately ask whether a reasonable person might conclude the military judge's impartiality could be questioned.

Contrary to Appellant's argument, we do not place much stock in certain events he points to on appeal, such as the Defense's last-minute review of the Government's closing-argument slides. From our review of the record, trial defense counsel offered to quickly review the slides on the spot, and they did so. The Defense did not object or ask for an Article 39(a), UCMJ, session or seek any other remedy, so we see nothing that would illuminate our analysis of the military judge's decision not to recuse himself. Similarly, the alleged "selective enforcement" of the scheduling order is insufficiently supported by the record before us. To the extent Appellant is trying to point to the Defense's request to file their failure to state an offense motion only after trial commenced, we conclude the military judge was on firm legal footing and well within his discretion in denying that request.

While we may see indications of an annoyed or brusque military judge, we see less to support the notion of actual deep-seated antagonism towards the Defense. Reasonable observers could question whether this court-martial was carried out in an exemplary fashion, but we conclude that—on balance—the military judge's conduct would not give rise to a reasonable person concluding his impartiality might reasonably be questioned. His conduct did not rise to the level that would undermine the court-martial's legality and fairness, and we therefore decline to find the military judge abused his discretion in not recusing himself.

Even if we had concluded the military judge should have recused himself from Appellant's court-martial, we would not grant Appellant relief based upon our analysis of the *Liljeberg* factors. First, Appellant points to only a few examples of injustice he personally suffered. Trial defense counsel were denied the ability to display text messages to the members during their opening statement, even after satisfying their discovery obligations. The Defense's opening statement was also derailed for a period of time based upon trial counsel's objection and the subsequent confusion over and discussion about the military judge's written ruling. Beyond these examples, however, Appellant argues less

that he was personally prejudiced by adverse rulings and more that his trial might seem unfair to an outside observer. We may not endorse the tone of the entire court-martial, but even caustic comments towards counsel are qualitatively different from incorrect adverse rulings with prejudicial impacts. Our review of the record reveals comparatively few instances of the latter and no indication that the errors we do find were the result of this particular military judge's service on Appellant's court-martial.

Regarding the second *Liljeberg* factor, we see little indication that granting relief in this case would result in other military judges more carefully examining their own possible grounds for disqualification. We make this assessment based upon the fact that if the military judge here should have recused himself, he should have done so under an appearance of bias standard. Given the highly context-specific analysis that standard calls for, we are unconvinced that granting relief under the unique facts presented here would provide other judges with much useful guidance for assessing their own conduct in other cases. Instead, we believe military judges will be mindful of our above analysis and be vigilant for the appearance of bias even in the absence of Appellant being granted relief.

Finally, under the third *Liljeberg* factor, we see little risk of undermining the public's confidence in the military justice system for many of the same reasons we determine that a reasonable person is not likely to conclude the military judge's impartiality might reasonably be questioned. We think that while the public may rightfully have high expectations for the military justice system, the public must also recognize that it is an adversarial system comprised of imperfect human beings—one in which counsel and military judges will invariably debate and disagree with each other. Demonstrations of impatience or criticism by the military judge in this case are simply inadequate to give rise to an objective risk of undermining the public's confidence in the overall justice system.

## B. Ms. KT's Refusal to Disclose Contact Information

On appeal, Appellant argues the military judge abused his discretion by permitting Ms. KT to testify without first compelling her to either provide contact information for her mother or, alternatively, answer questions in support of the Defense's motion to compel her mother's production.

### 1. Additional Background

One of the Defense's theories was that Ms. KT only alleged she had been sexually assaulted after she talked to her mother. Specifically, the Defense alleged that Ms. KT spent the weekend as well as the morning and early afternoon of Monday, 27 August 2018, with Appellant before driving back home. Over the course of several hours, Ms. KT continued to exchange affectionate

text messages with Appellant and discussed her plan to spend time with Appellant the upcoming weekend. That night, Ms. KT texted Appellant—apparently in response to an incoming phone call from him—stating that she was talking to her mother. The following morning, Ms. KT texted Appellant that she "just need[ed] time." About three hours later, she texted him that she felt "super disrespected." This led to a response from Appellant in which he said, *inter alia*, "I got carried away and I'm so sorry for what happened. . . . I regret everything. This is the biggest mistake I've ever made. . . . It'll take time to heal and I know that. I don't expect you to be over this right now." Over the following days, Ms. KT expressed her frustration with Appellant and the impact his actions had on her, while Appellant made significant additional admissions about the assault.

The Defense postulated that it was after Ms. KT's Monday-night conversation with her mother that Ms. KT's attitude towards Appellant shifted dramatically. Ms. KT, however, refused to be interviewed by trial defense counsel prior to trial. The Defense requested Ms. KT's mother's contact information in discovery, but trial counsel maintained they did not have it. Upon receiving the Defense's request, the Government sought the contact information from Ms. KT, but Ms. KT—through her special victims' counsel—declined to provide it. Government agents attempted to assist the Defense in this endeavor by providing possible phone numbers for Ms. KT's mother, but none of the numbers was valid. As a result, the Defense had little else other than the text message to confirm or refute their understanding of when Ms. KT spoke with her mother.

On 21 August 2018—the day before the motions hearing began—the Defense made a motion to compel the production of Ms. KT's mother via subpoena and to abate of the proceedings until Ms. KT agreed to interview with the Defense.[23] During the hearing on this motion, trial defense counsel indicated they wished to call Ms. KT to testify. Circuit trial defense counsel also said he did not intend "to call her to interview her," and that perhaps the military judge would "accept the proffer from her counsel that she won't talk to [the Defense]." He continued: "So I don't know if the [c]ourt needs to hear from her saying she won't talk to me, but we have an issue in which—there some [sic] evidence in conversation with her mother happens [sic] both very approximate [sic] in time to the charged event." After some discussion, the following colloquy occurred:

> MJ: All right. But you don't actually know what, if anything, she discussed with her mother?

---

[23] Nothing in the record indicates that the Defense requested the Government produce Ms. KT's mother for trial prior to making this motion.

CDC: I don't. I haven't spoken with mother and I haven't spoken with [Ms. KT].

MJ: And so you want to call [Ms. KT] to find out what she talked about with her mother?

CDC: Yes.

MJ: And if she says on the stand, I never talked to my mother that night. I was lying to him.

CDC: Yes. And instead we have an impeachable statement, but it doesn't help me with producing the mother. You're right.

MJ: Sure. And it doesn't help—I'm not here to help build impeachable statements either. I mean, if we don't know what she's going to say, then we don't know if she's going to be helpful to me in the analysis of whether or not you've met your burden of production of mother. That's really what it's all about. But you haven't—I understand you haven't spoken to [Ms. KT] and that's another discussion. But I understand that you want to talk to someone to find out what that conversation was with mom but you have no idea what they are [sic] she talked about.

CDC: Well—

MJ: You're speculating that there was discussion post-alleged assault that then led to [Ms. KT] taking some certain action—breaking up with the accused, et cetera—and you believe that mother may have said something to [Ms. KT] that caused her to suddenly change her attitude towards the accused, but you don't know that for sure.

CDC: I have—well, I don't know for sure, but I have a very good faith basis to believe it because [Ms. KT's father] says, mom called me and told me that [Ms. KT]—something happened to her, and that's why you need to call her.

MJ: So the father said that the mother called him and said call her because she just told me something happened.

CDC: Yes, Your Honor. So that's my good faith basis, not just that this content was discussed but when it was discussed, because of where [Ms. KT's father]—what he says about the conversation and when he places it.

MJ: Okay. And you're being told that the contact information is—the family is not willing to provide you with the contact information?

CDC: Yes, Your Honor. . . .

. . . .

MJ: Okay. So the relevance is essentially—the defense theory is that it's potential impeachment evidence. That's the relevance of [Ms. KT's] mother because there's at least some indication that the alleged victim was in a certain positive frame of mind—however you want to characterize it—with the accused. Post-offense, she spoke to her mother then immediately thereafter, things turned. And the theory being is that something that mom said to her or implied to her caused her to change and then ultimately report an offense?

CDC: Yes, sir.

Before moving on to the next motion, the military judge asked, "Anything further on [Ms. KT's] mother?" Trial defense counsel answered, "In terms of argument or evidence, Your Honor?" The military judge replied,

Just argument. I mean I think I've got the gist of the relevance. I think you do have a bit of a problem in that you don't know what she's going to say. So relevance, in the traditional sense, I'm not sure 100 percent that you've established relevance because you don't know what she's going to say. I get that that's not your fault, but ultimately it is [a] factor to consider in the analysis. But I do believe you've raised a valid theory as to why she might be relevant on the issue of motive, bias, impeachment, et cetera. So I'll consider all that, but ultimately I see this as a witness production issue [ ] so I'll analyze that through that particular lens.

Although the Defense conceded the military judge had no authority to compel Ms. KT to submit to a pretrial interview, trial defense counsel argued the proceedings should be abated until Ms. KT agreed to a defense interview due, in part, to the fact Ms. KT had been interviewed by trial counsel. The military judge declined to abate the proceedings on this ground, finding there was no indication the Government had done anything to impede the Defense's access to Ms. KT. The military judge did direct trial counsel to continue to encourage Ms. KT to interview with the Defense, and he said he would consider such remedies as allowing the Defense some period of time after her direct testimony to prepare for cross-examination as well as greater latitude in that cross-examination.

The military judge further ruled he would not order the production of Ms. KT's mother, whom he treated as an unavailable witness. He invoked the standard for production of an unavailable witness under R.C.M. 703(b)(3),

which relates to witnesses deemed unavailable under the meaning of Mil. R. Evid. 804(a). Under this standard, a military judge shall grant relief when the testimony of an unavailable witness "is of such central importance to an issue that it is essential to a fair trial, and . . . there is no adequate substitute for such testimony." R.C.M. 703(b)(3). The military judge said Ms. KT's mother's testimony was "being raised under an impeachment theory, and only to the extent that it would provide [Ms. KT] with a motive to fabricate or be some evidence of bias." He concluded the Defense had not met the R.C.M. 703(b)(3) "central importance" standard, "even assuming [Ms. KT] did discuss the alleged assault with her mother and then changed her tone towards [Appellant] after that conversation." He based this conclusion on the fact that in the text messages, Appellant was "apologizing for his conduct in a manner that could constitute consciousness of guilt;" that Ms. KT's mother's testimony would only be relevant for impeachment if Ms. KT denied speaking to her mother; and that Ms. KT's mother's testimony was unnecessary to establish motive or bias, because the Defense already had the text message. The military judge explained: "The timing of the text message reference to a conversation with her mother provides the [D]efense with the opportunity to explore this issue on cross-examination . . . to demonstrate on the part of [Ms. KT] a possible bias or motive to fabricate." The military judge also concluded the Defense had failed to meet their burden "to provide the witness[']s name, contact information and a synopsis of her expected testimony" under R.C.M. 703(c)(2)(B)(i).[24]

Just before opening statements, the military judge returned to the issue of Ms. KT refusing to interview with the Defense and asked trial defense counsel for their "proposed remedies." The Defense suggested a recess for Ms. KT to reconsider submitting to an interview; that the military judge personally encourage her to be interviewed; being afforded "expanded cross," to include asking Ms. KT about her refusal to interview with the Defense and her "refusal to provide access to other witnesses in this case to include her mother;" and the military judge giving an instruction to the members on the matter.[25] The military judge said he would permit "a reasonable inquiry on cross examination into the fact that [Ms. KT] declined to submit to a pretrial interview and that she did not wish for her mother to meet with [the D]efense for an interview." He further said he would entertain a request for a 30-minute recess after Ms.

---

[24] The military judge further said: "Defense has provided no legal authority, nor could the court find any legal authority to support the proposition that the [D]efense is entitled to the relief requested when they are unable to discover through their own reasonable efforts information sufficient to meet their burden under [R.C.M.] 703 when there is no evidence of government interference."

[25] The Defense indicated a draft instruction would be prepared at a later point in time.

KT's direct testimony to permit the Defense to prepare for her cross-examination.

In the Defense's opening statement, trial defense counsel told the members the events regarding Ms. KT "turn[ed] from a misunderstanding to a criminal investigation" once Ms. KT talked to her mother after she returned home from visiting Appellant. Trial defense counsel said that it was after the call when "the tone changes" and "[i]t's no longer a mistake. Now it's an accusation." He told the members they would not be hearing from Ms. KT's mother.

When Ms. KT took the stand, her testimony ran counter to the Defense's theory about the timing of her call with her mother. Ms. KT testified on direct that she first talked to her mother and disclosed the assault as she drove home from Appellant's house and not at some later point, as the Defense had posited during their opening statement. On cross-examination, Ms. KT further testified she had lied to Appellant when she texted him that she was talking to her mother, and she was actually talking to a friend of hers at the time. She explained she felt Appellant was less likely to question her choosing to talk to her mother instead of him, versus than if she was merely talking to a friend. Ms. KT also conceded she hid her mother's contact information from the Defense and asked her father to do the same. Trial defense counsel did not ask Ms. KT to provide that contact information while she was on the stand, nor did they ask the military judge to direct Ms. KT to disclose it.

After the Government rested, the Defense moved to strike Ms. KT's testimony or, alternatively, to dismiss the specification alleging Appellant had sexually assaulted her. The Defense said their alternate request was rooted in an alleged violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The Defense accused the Government of not revealing that Ms. KT had lied to Appellant in her text message when she said she was talking to her mother. The Defense also argued that even if the Government was unaware Ms. KT had lied to Appellant about whom she was talking to, the Defense was blindsided by this testimony, resulting in undue prejudice to Appellant because the theory the Defense advanced to the members in the opening statement had been squarely undermined. The Defense also suggested Ms. KT had been able to modify her testimony after hearing the Defense explain their theory during the motions hearing.

In discussing the matter with the military judge, trial defense counsel conceded they did not know whether or not trial counsel were aware that Ms. KT was not actually talking to her mother when she texted Appellant that she was. Trial counsel said they did not recall asking Ms. KT about the text message and were "not tracking that [they] even talked with her about that message, let alone knew that there was some dishonesty there." The military judge found there had been no violation of *Brady*, saying, "I don't believe the

[G]overnment specifically knew that the witness was going to say that[,] she may have just never been asked by anyone," and that there was no evidence the Government withheld or failed to turn over any evidence.

The military judge reminded the Defense that he had no authority to compel Ms. KT to submit to a pretrial interview and that Appellant's constitutional confrontation rights were satisfied by virtue of Ms. KT testifying. He then said that the Defense had approached their opening statement "with eyes wide open"—that is, they knew they had not been able to interview Ms. KT or her mother to confirm the two of them actually had a conversation at the time the Defense believed they had. Although the military judge said he recognized Ms. KT had undermined the Defense's theory, such did not warrant striking her testimony—especially in light of the fact he had granted trial defense counsel additional time after the direct examination to prepare their cross-examination.

In the Defense's closing argument, trial defense counsel told the members:

> Reasons for reporting. We hear for the first time, she talked to her mom on the way home . . . she was trying to figure out what to do . . . . And she talks to her dad and there is an important intervening step that I hope you picked up her dad does not hear what happens. Dad gets a text from a mysterious, unheard from mother. And what it says is you need to talk to your daughter. And so this first version what happens, this first version of what she says, he never got to hear. The Government did not present it to you.

At this point, trial counsel said, "Objection, Your Honor, it is improper argument." The military judge sustained the objection and told the members to recall his instruction that they "are to consider the evidence that is properly before [them] when considering whether or not the Government has met their burden in this case." Trial defense counsel then continued, "And what you heard from [Ms. KT] is that she hid her. Among other things hid in this investigation, she hid her."

#### 2. Law

##### a. Discovery

Under Article 46(a), UCMJ, "the trial counsel, the defense counsel, and the court-marital shall have equal opportunity to obtain witnesses and other evidence" pursuant to rules prescribed by the President. 10 U.S.C. § 846(a). One of those rules, R.C.M. 701(e), provides that each party shall have "equal opportunity to interview witnesses." Even in the absence of a defense request, trial counsel must disclose "the existence of evidence known to trial counsel" which tends to be exculpatory, be evidence in mitigation or extenuation, or

37

"[a]dversely affect the credibility of any prosecution witness or evidence." R.C.M. 701(a)(6). Trial counsel has the "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Evidence is favorable if it is exculpatory, substantive evidence or evidence capable of impeaching the [G]overnment's case." *United States v. Behenna*, 71 M.J. 228, 238 (C.A.A.F. 2012) (citations omitted). Impeachment evidence "may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

### b. Production

An accused has the due process right under the Sixth Amendment[26] to compulsory process to obtain and present witnesses to establish a defense. *Washington v. Texas*, 388 U.S. 14, 18–19 (1967). Under the rules promulgated by the President, "[e]ach party is entitled to the production of any witness whose testimony on a matter in issue on the merits or on an interlocutory question would be relevant and necessary." R.C.M. 703(b)(1). This includes "the benefit of compulsory process." R.C.M. 703(a). An accused's right to compel the production of witnesses for trial is not unfettered; rather, the right is tied to "consideration of relevancy and materiality of the expected testimony." *United States v. Carpenter*, 1 M.J. 384, 385 (C.M.A. 1976) (citations omitted).

Under R.C.M. 703(c)(2)(A) and (B), the Defense is required to submit a written request for the production of witnesses to trial counsel, and that request "shall include the name, telephone number, if known, and address or location of the witness such that the witness can be found upon the exercise of due diligence" along with "a synopsis of the expected testimony sufficient to show its relevance and necessity." Trial counsel then arranges for the production of such witnesses unless trial counsel contends production is not required—a contention the defense may challenge before a military judge. R.C.M. 703(c)(2)(D).

If the military judge grants a defense motion to produce a witness, trial counsel shall produce the witness. *Id*. The presence of civilian witnesses may be obtained by subpoena issued by trial counsel. R.C.M. 703(g)(3). When a subpoenaed witness neglects or refuses to appear, the military judge may issue a

---

[26] U.S. CONST. amend. VI.

warrant of attachment to compel that witness's attendance at a court-martial. R.C.M. 703(g)(3)(H).

In the event a witness is deemed "unavailable," the standard for relief is not simply that the witness's testimony is relevant and necessary, but that it "is of such central importance to an issue that it is essential to a fair trial, and . . . there is no adequate substitute for such testimony." R.C.M. 703(b)(3). The term "unavailable" is given the meaning found in Mil. R. Evid. 804(a). Under that rule, a witness is unavailable if he or she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure" the witness's attendance. Mil. R. Evid. 804(a)(5). Upon a showing that a witness both meets the "central importance" standard and is unavailable, "the military judge shall grant a continuance or other relief in order to attempt to secure the witness'[s] presence or shall abate the proceedings . . . ." R.C.M. 703(b)(3). Unavailability is determined by asking "whether the witness is not present in court in spite of good-faith efforts by the Government to locate and present the witness." *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007) (quoting *United States v. Cokeley*, 22 M.J. 225, 228 (C.M.A. 1986)). Government effort to produce a witness is a prerequisite to finding a witness to be unavailable. *Id.* (citing *Barber v. Page*, 390 U.S. 719, 724–25 (1968)).

We review a military judge's rulings on discovery and production matters, as well as a military judge's selection of remedies for violations, for an abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015) (citations omitted) (reviewing military judge's ruling finding discovery violations); *United States v. Breeding*, 44 M.J. 345, 349 (C.A.A.F. 1996) (citation omitted) (reviewing military judge's denial of request for production of witnesses); *Cokeley*, 22 M.J. at 229 (citation omitted) (reviewing military judge's determination of witness availability). "The abuse of discretion standard calls for more than a mere difference of opinion." *United States v. Wicks*, 73 M.J. 93, 98 (C.A.A.F. 2014) (internal quotation marks and citation omitted). An abuse of discretion only occurs "when [the military judge's] findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted).

A military judge's denial of a witness request will not amount to an abuse of discretion unless we have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (internal quotation marks and citations omitted). In the context of witness-production issues, the factors to be considered in determining whether a

witness is necessary include: "the issues involved in the case and the importance of the requested witness to those issues; . . . whether the witness's testimony would be merely cumulative; and the availability of alternatives to the personal appearance of the witness." *United States v. McElhaney*, 54 M.J. 120, 127 (C.A.A.F. 2002) (citations omitted). The timeliness of the defense's request may also be considered. *Id*. (citations omitted).

If an appellant is entitled to the production of a witness, the erroneous denial of such production will not require relief if we are convinced the error was harmless beyond a reasonable doubt. *United States v. Shelton*, 62 M.J. 1, 3 (C.A.A.F. 2005) (citing *United States v. Powell*, 49 M.J. 220, 225 (C.A.A.F. 1998)).

### 3. Analysis

#### a. Compelling Ms. KT to Answer Questions

The thrust of Appellant's argument on appeal is that Ms. KT improperly withheld her mother's contact information from the Defense and that the military judge erred in allowing her to testify without first disclosing that information. Appellant also argues that although Ms. KT was not a party to the court-martial, she "should be viewed as a party, or at the very least, a quasi-party, to the proceeding" based upon the rights afforded to crime victims—and she was therefore bound by discovery rules.

Analysis of Appellant's allegation of error is complicated by the fact that Appellant does not precisely identify what the error was or who committed it. In his pleadings before this court, Appellant framed this assignment of error as the military judge erring by "failing to compel [Ms. KT] to answer relevant questions to remedy her obstruction of access to witnesses and evidence." Yet, at no point during Appellant's court-martial did the Defense ask the military judge to compel Ms. KT to answer any particular questions. When Ms. KT testified during the trial, she admitted she had withheld information from the Defense and that she had urged her father to do the same. But Ms. KT did not refuse to answer any questions put to her, nor did the Defense ask the military judge to compel her to answer any.

During the earlier motions hearing, the Defense sought two forms of relief regarding Ms. KT via written motion: (1) to abate the proceedings on the specification related to Ms. KT until Ms. KT agreed to be interviewed by the Defense, and (2) to order the Government to subpoena Ms. KT's mother for trial. As to the first form of relief, the Defense's argument was that Ms. KT had agreed to be interviewed by the Government while declining to be interviewed by the Defense, thereby depriving the Defense of the equal opportunity to interview witnesses. Despite conceding the military judge had no authority to

compel such an interview, the Defense asked him to abate the proceedings until she submitted to an interview. The motion did not, however, seek to require Ms. KT to divulge her mother's contact information or any other particular matter, nor did it indicate any particular topics the Defense wished to ask Ms. KT about in the interview.

With respect to the production of Ms. KT's mother, trial defense counsel asked to call Ms. KT to testify on the motion so that they could ask her about the substance of her phone call with her mother. Trial defense counsel did not, however, specifically indicate what information they intended to elicit from Ms. KT, much less whether they wished to ask her for the contact information while she was on the stand. The military judge declined to receive evidence on the motion, short-circuiting the Defense's effort to question Ms. KT at all, so we can only speculate about what specific questions trial defense counsel might have wanted to ask Ms. KT. The military judge did, however, expressly state the Defense would be permitted to cross-examine Ms. KT during the findings portion of the trial about the fact she did not want her mother to be interviewed by the Defense.

At the close of the Government's case—when the Defense asked the military judge to either strike Ms. KT's testimony or dismiss the sexual assault specification pertaining to Ms. KT—the Defense did not argue that Ms. KT had refused to answer any particular question or that the military judge should have compelled her to provide any information. Instead, the Defense's arguments were: (1) that the Government failed to disclose that Ms. KT lied to Appellant when she told him via text that she was talking to her mother, when in fact she was talking to a friend; and (2) that Ms. KT's refusal to be interviewed resulted in a "trial by ambush."

We are somewhat stymied by Appellant's claim that the military judge abused his discretion by not compelling Ms. KT to "answer relevant questions," because she never refused to answer any questions, and the Defense never asked the military judge to compel her to do so. During oral arguments in this case, Appellant asserted his claim of Ms. KT not being compelled to answer relevant questions should be read as an allegation the military judge erred by not allowing the Defense to call Ms. KT to the stand for the purposes of the motion.

Had the military judge simply permitted the Defense to present evidence on this motion by way of Ms. KT's testimony, we would actually know what questions Ms. KT did or did not answer, and we would have clearer understanding of the relevance of Ms. KT's mother's testimony. Instead, the military judge decided the motion based upon the proffers of counsel, even though the better practice is to permit counsel to call witnesses and present actual evi-

dence. *See, e.g.*, *United States v. Stubbs*, 23 M.J. 188, 195 (C.M.A. 1987). Nevertheless, it is not necessarily an abuse of discretion to accept undisputed representations of counsel for purposes of deciding motions. *See, e.g.*, *United States v. Vanderwier*, 25 M.J. 263, 266 n.3 (C.M.A. 1987). In the end, the only indication we have as to what exactly trial defense counsel wished to ask Ms. KT about—besides her declining to interview with the Defense—is trial defense counsel's ambiguous statement that they "have an issue" regarding "evidence in conversation with her mother happens [sic] both very approximate [sic] in time to the charged event." This statement is far too vague for us to determine what questions the Defense wanted to put to Ms. KT, and we see no basis for concluding the military judge abused his discretion by denying the Defense the ability to call her as a witness on the motion.

### b. Ms. KT's Refusal to Submit to Pretrial Interview

At trial and on appeal, Appellant has correctly conceded Ms. KT was under no obligation to submit to a pretrial interview. *See United States v. Morris*, 24 M.J. 93, 95 (C.M.A. 1987). Similarly, in the absence of evidence that trial counsel was involved in Ms. KT's refusal to be interviewed by the Defense, there is no basis for finding an Article 46, UCMJ, violation. *Id.*; *see also United States v. Killebrew*, 9 M.J. 154, 160 (C.M.A. 1980) (citations omitted) (noting that a witness may refuse to answer defense questions as long as the Government did not induce the refusal). "No *party* may unreasonably impede the access of another party to a witness or evidence." R.C.M. 701(e) (emphasis added). However, Ms. KT was a not a "party." *See* R.C.M. 103(17) (defining "party" as the accused, defense counsel, trial counsel, and agents acting on their behalf).[27] We reach the same conclusion regarding her special victims' counsel who represented not the Government, but Ms. KT herself. And given that Appellant has not alleged—and there is no evidence to support—that the Government possessed and failed to turn over the information Appellant sought, there has been no *Brady* violation.

### c. Ms. KT's Withholding of Her Mother's Contact Information

As a result of the foregoing, we are left with a situation in which Ms. KT, a civilian victim, sought to prevent the Defense's access to a witness—her mother. Because the Defense did not seek to compel Ms. KT to provide her mother's contact information, the question becomes whether the military judge erred by not *sua sponte* compelling Ms. KT to disclose it. We conclude he did not. While military judges are not potted plants, they must remain impartial,

---

[27] Appellant asks us to consider Ms. KT to be a party or a "quasi-party" based upon the fact crime victims have been afforded certain rights with respect to courts-martial. Appellant cites no authority for this proposition, and we are aware of none. We decline to extend the definition of "party" beyond that found in R.C.M. 103(17).

and we see no error—plain or otherwise—in a military judge refraining from seeking discovery for one party's benefit when that party has not requested the military judge's help in securing it in the first place.

### d. Denial of the Defense's Motion to Produce Ms. KT's Mother

In spite of Appellant framing this issue as one in which Ms. KT should have been compelled to provide her mother's contact information, the more pertinent question seems to be whether the military judge erred in not ordering production of Ms. KT's mother for trial pursuant to the Defense's motion. We asked the parties to provide oral argument on this point.

We conclude that the military judge's ruling was erroneous insofar as he determined Ms. KT's mother was unavailable under Mil. R. Evid. 804(a). Under that rule, a witness is "unavailable" when she either refuses to testify about the subject matter *despite an order from the military judge to do so*; or when she is absent and her presence cannot be procured *by process or other reasonable means*. In this case, the military judge never ordered Ms. KT's mother to testify, nor did he direct the Government to explore any means at all to secure her presence. Despite having the ready ability to require trial counsel to seek Ms. KT's mother's presence at trial, the military judge simply found that Ms. KT's mother was unavailable without providing any explanation for how he reached that conclusion. Ms. KT's desire that her mother not testify is inadequate to establish her mother's actual unavailability; even if Ms. KT's mother was reluctant to testify—which, of course, there is no direct evidence so indicating—the standard for unavailability would be that she *refused* to testify after being ordered to do so, she was not amenable to process, or her presence could not be procured by other reasonable means.

Because the military judge erred in finding Ms. KT's mother "unavailable," he thereby applied the wrong standard for deciding whether to order her production. Under R.C.M. 703(b)(1), Appellant had the right to the production of any witness whose testimony on a matter in issue would be relevant and necessary. Once a witness was deemed unavailable, however, Appellant was only entitled to relief upon meeting the heightened standard of demonstrating the witness's testimony was "of such central importance to an issue that it [was] essential to a fair trial." The military judge determined Appellant had not met this higher standard and was, therefore, entitled to no relief. By incorrectly finding Ms. KT's mother unavailable, the military judge applied the wrong standard to analyzing the question of whether he should order Ms. KT's mother's production. That is, instead of correctly deciding Appellant's motion to order the production of Ms. KT's mother, the military judge erroneously analyzed whether Appellant was entitled to relief based upon Ms. KT's mother's purported unavailability.

In employing the incorrect standard regarding a witness who had not actually been shown to be "unavailable," the military judge abused his discretion insofar as his analysis was predicated on an erroneous view of the law. This does not end our inquiry, as we next ask whether Appellant was entitled to Ms. KT's mother's production. Answering that question is difficult, as the military judge hobbled the Defense's attempt to demonstrate the relevancy of her testimony when he declined to permit the Defense to call Ms. KT to testify about her conversation with her mother. Instead, the military judge largely decided the production motion not upon evidence, but upon the proffers of counsel—proffers which were vague in light of the fact the Defense had never been able to talk to either Ms. KT or—because of Ms. KT's efforts—Ms. KT's mother.

For the purposes of this appeal, we will assume, without deciding, that Ms. KT's mother's testimony would have been relevant and necessary on the merits, and Appellant was therefore entitled to have her produced. As a result, the issue becomes whether the military judge's denial of her production was harmless beyond a reasonable doubt. We conclude that it was. Whatever Ms. KT's mother might have said about influencing her daughter with regards to Ms. KT's report of sexual assault, Appellant's text messages largely corroborate Ms. KT's testimony that Appellant in fact assaulted her. In those messages, Appellant said he "got carried away," that he was "so sorry for what happened," that he "regret[ted] everything," and that it was "the biggest mistake [he had] ever made." Two days later, he texted Ms. KT saying he had had time to think about "what [he] did," that he "regret[s] it so much," that he would "never do that again," and that he "respect[s her] boundaries." He wrote: "I wish it never happened. I wish I would have never did that." Any ambiguity in those texts is removed by other texts in which Appellant responds to a question from Ms. KT asking him why he did "that"—he replied, "I think that in that moment I wanted to have sex with you again. And when it was happening it felt really good;" "I wasn't listening in that point of time and I was being selfish as to how you felt. I should have stopped and listened to you;" and, "It's your body and you have the right to say no."

Based upon Ms. KT's testimony about the assault and Appellant's own words in the following days, we conclude the denial of Ms. KT's mother's production was harmless beyond a reasonable doubt. *See United States v. Hall*, 58 M.J. 90, 94–95 (C.A.A.F. 2003).

## C. Reconsideration of the Mil. R. Evid. 412 Ruling

As discussed above in Section II.A.1.c., *supra*, the military judge *sua sponte* reconsidered his ruling under Mil. R. Evid. 412 regarding Appellant's and Ms. KT's relationship in the midst of the Defense's opening statement. Appellant asserts this reconsideration was erroneous, and he argues that he was prejudiced by the reconsideration insofar as it occurred while trial defense counsel

was delivering the Defense's opening statement, thereby "disturbing the flow of information and impact" of that presentation. Appellant theorizes that "[t]he members were more than likely left wondering what had happened and what the Defense did wrong" to result in trial counsel's objection and the ensuing 30-minute delay—in part because the military judge did not explain anything to them about trial counsel's objection or the delay when they returned to the courtroom. The Government contends this is "pure speculation" and that the military judge's as-reconsidered ruling was more appropriate than his original ruling. We note that trial defense counsel neither requested any particular instruction nor sought any other relief as a result of the ruling's reconsideration.

Appellant does not argue that the military judge's reconsidered ruling on the Mil. R. Evid. 412 motion was incorrect. Instead, he argues the military judge erred in deciding to reconsider the original ruling.

### 1. Law

Under R.C.M. 905(f), the military judge may reconsider any ruling—other than one amounting to a finding of not guilty—either upon the request of a party or *sua sponte*. Military judges must be sensitive to the possibility that reconsidering an earlier ruling favorable to the defense may unduly prejudice an accused or otherwise raise the question of whether a mistrial is appropriate. *See United States v. Cofield*, 11 M.J. 422, 431 n.14 (C.M.A. 1981). We review a military judge's decision to reconsider a ruling for abuse of discretion. *See, e.g., United States v. Newhouse*, No. ACM 38019 (recon), 2014 CCA LEXIS 660, at *10 (A.F. Ct. Crim. App. 4 Sep. 2014) (unpub. op.) ("The fact that a ruling upon reconsideration differs from an initial ruling does not necessarily compel a finding that either was an abuse of discretion.").

### 2. Analysis

Although the military judge's handling of this matter left a great deal to be desired, he had the inherent authority to reconsider his original ruling at any point during Appellant's court-martial. Because Appellant does not argue the military judge's as-reconsidered ruling on the Mil. R. Evid. 412 issue was erroneous, our focus is on whether the military judge abused his discretion in electing to reconsider the motion or whether he unfairly prejudiced Appellant in doing so. We conclude he did neither.

At the point of trial counsel's objection, trial defense counsel had just told the members that Appellant and Ms. KT had "consensual sex on multiple occasions the first week." The military judge's written ruling originally permitted the parties to elicit evidence as to a specific number of times Appellant and Ms. KT engaged in sexual intercourse, but his reconsidered ruling barred any evidence "regarding frequency." Because trial defense counsel did not actually comment on the specific number of instances of sex prior to the objection, the

military judge's reconsidered ruling did not create the situation wherein the Defense promised to present evidence of a fact they would no longer be permitted to prove. Instead, the Defense's case was prospectively limited to a degree, although Appellant does not argue that his defense was prejudiced in any substantive way by the new ruling. Thus, we do not see any indication Appellant's presentation of his overall case was impacted by the substance of the reconsidered ruling, and we perceive no unfair prejudice from there being a reconsideration at all. That conclusion is further bolstered by the fact that the military judge never told the members that he had, in fact, sustained the Government's objection to the "multiple occasions" comment, which meant the members were never told to disregard or otherwise minimize trial defense counsel's comment.

We agree that the extended break during the Defense's opening statement likely left the members wondering what was going on, but that is generally true of all Article 39(a), UCMJ, sessions during which members are directed to leave the courtroom. As is typically done, the military judge in this case told the members in his initial instructions that there would be hearings outside of their presence, and he asked for their patience and understanding when those hearings occurred. This tells us the members were generally aware they would be asked to leave to the courtroom on occasion in order for the military judge to resolve matters. Appellant has provided no evidence the members drew any conclusion adverse to his case based on this particular session, and we will not infer they did, especially in light of the fact that not only did this occur very early in the trial, but the military judge never informed the members he had ruled adversely to the Defense. Plainly, a better approach would have to been to accurately establish the parameters of the allowable evidence prior to opening statements so that the parties had a degree of clarity on how to frame their respective cases, but we see no unfair prejudice to Appellant under the facts presented here. Thus, Appellant is entitled to no relief on this ground.

## D. Military Judge's Instructions on Attempted Sexual Assault

On appeal, Appellant argues the military judge erred when he declined the Defense's request to specify in his instructions to the members which overt acts the Government needed to prove in order to establish Appellant had attempted to sexually assault Ms. ES as alleged in the Specification of Charge II. Although we disagree with Appellant's argument as he frames it, we conclude the military judge's instructions were incorrect and that Appellant's conviction on this specification cannot stand.

### 1. Additional Background

In July 2018, Ms. ES and Appellant had been together about five years and married for the last two of those years. The marriage, however, was not going

well, and the two had talked about divorcing. Ms. ES was also making arrangements to fly to her parents' home in California with no immediate plans to return to the house she shared with Appellant in Washington.

Although Ms. ES could not remember the exact date, she testified that one night in July 2018 she was laying on the couch when Appellant came home at the end of his typical mid shift—a shift which she said ended at 2200 hours.[28] According to her testimony, Appellant took off his uniform jacket and hat and then walked over to her, got down on his knees in front of the couch so that his waist was "probably on level with the couch," and tried to kiss her despite her saying "no." She testified, "And he kept trying to kiss me and he was touching me and I was telling him to stop." She said Appellant then "grabbed [her] arms and held them together with one of his hands" while he "was touching [her] all over" as she was "asking him to stop." Ms. ES said she was "struggling" with Appellant, but he was able to "move[ her] leg open so that he can get in between [her] legs," while still touching and trying to kiss her. During the struggle, Ms. ES said she could feel Appellant's erect penis on her vagina through their respective clothing. Ms. ES kept telling Appellant to stop, at which point Appellant "grabbed both of [her] arms" and said, "[N]o, you stop," and then "shook" her, finally "[throwing her] leg to the side." Ms. ES testified Appellant "shuffle[d] back on his knees . . . to get out." She "closed [her] legs," and then Appellant said, "[Y]ou're my wife so I can take it if I want to." A photograph of a bruise on Ms. ES's right forearm was admitted as evidence of an injury she sustained during the struggle.

A few days after the assault, Ms. ES called her brother, Mr. AK, and told him what had occurred. Mr. AK then called Appellant to hear his version of events. Mr. AK testified that during that call, Appellant admitted grabbing Ms. ES's wrists, holding her down and trying to kiss her and said that "[h]e wanted to have sex with his wife to see if there's anything still there emotionally."

Based on these events, Appellant was charged with committing abusive sexual contact on Ms. ES by touching her vulva with his penis through their clothing with an intent to gratify his sexual desire, without her consent, and by causing her bodily harm by so touching her. He was also charged with attempting to sexually assault her with a specification which alleged Appellant "did . . . attempt to commit a sexual act upon [Ms. ES], to wit: penetrating her vulva with his penis, by causing bodily harm to her, to wit: penetrating her vulva with his penis, without her consent."

---

[28] One of Appellant's co-workers, as well as his roommate, who was the shift lead, testified the mid shift ended at 2300 hours, not 2200.

Appellant was acquitted of the former and convicted of the latter. As discussed in Section II.A.1.a., *supra*, the Defense unsuccessfully sought the pretrial dismissal of the attempted sexual assault specification under the theory that it did not provide Appellant with adequate notice of how he was being accused of attempting to commit the offense. Essentially, the Defense argued the Government had failed to allege in the specification what particular act Appellant had taken in furtherance of the attempt.

Once the Government rested, the Defense moved the military judge to enter a finding of not guilty for the attempted sexual assault specification. In this mid-trial motion, trial defense counsel argued the evidence was insufficient to show Appellant had taken a substantial step towards committing sexual assault, which had been charged as Appellant penetrating Ms. ES's vulva with his penis and causing her bodily harm by doing the same without her consent. The Defense's first argument was that—even accepting Ms. ES's testimony that Appellant had held her arms and kissed her—such conduct did not amount to a substantial step towards committing the charged conduct of attempting to penetrate Ms. ES's vulva with his penis, especially in light of the fact both Ms. ES and Appellant were fully clothed. The Defense's second argument was rooted in the notion that Appellant never intended to sexually assault Ms. ES because he did not try to penetrate her vulva with his penis, and not because he was thwarted by "unexpected intervening circumstances." The Defense's hypothesis seemed to be that the most Appellant intended to do was touch Ms. ES with his penis, through their respective clothing.

The military judge denied the Defense's motion, finding that Ms. ES's testimony established that Appellant "initiated contact by getting on top of her, forcing her legs apart, kissing her, holding her wrist, touching her body, and trying to remove her clothing."[29] He concluded this was "at least some evidence that would amount to more than mere preparation . . . and could be considered a substantial step towards the commission of the offense of sexual assault." The military judge further noted Appellant's statement that he could "take it," along with his comments to Ms. ES's brother, indicated Appellant's desire to engage in "sexual activity" with Ms. ES. Finally, the military judge found that Ms. ES's resistance to Appellant's advances was "at least some evidence of an intervening cause or circumstance that would prevent completion of the offense."

---

[29] Ms. ES never testified that Appellant either got on top of her or tried to remove her clothing during the episode.

Although the specification did not allege a particular act committed by Appellant in furtherance of his attempt, the military judge proposed to instruct the members:

> In order to find the Accused guilty of this offense you must be convinced by legal and competent evidence beyond a reasonable doubt, 1) That at or near Spokane, Washington, on or about 18 July 2018, the Accused did a certain act, that is: attempt to commit a sexual act upon [Ms. ES], to wit penetrating her vulva with his penis, by causing bodily harm to her, to wit: penetrating her vulva with his penis without her consent; 2) That the act was done with specific intent to commit the offense of sexual assault; 3) That the act amounted to more than mere preparation, that is, it was a substantial step and a direct movement toward the commission of the intended offense; 4) That such act apparently tended to bring about the commission of the offense of sexual assault, that is the act apparently would have resulted in the actual commission of the offense of sexual assault except for an unexpected intervening circumstance which prevented completion of that offense.

In defining preparation, the military judge proposed:

> To find the Accused guilty of this offense you must find beyond a reasonable doubt that the Accused went beyond preparatory steps and his acts amounted to [a] substantial step [and] a direct movement toward the commission of the intended offense. A "substantial step" is one that is strongly corroborative of the Accused['s] criminal intent and is indicative of his resolve to commit the offense. Proof that the offense of sexual assault actually occurred or was completed by the Accused is not required, however it must be proved beyond a reasonable doubt that at the time of the acts the Accused intended every element of sexual assault.

Trial defense counsel objected to the proposed instructions because they did not specify what the "certain acts" were that Appellant allegedly committed which tended to bring about the commission of the offense of sexual assault. Trial defense counsel further pointed to the instruction in the *Military Judge's*

*Benchbook*[30] that calls for specifying such acts for the members. In the *Benchbook*, the model instruction employs the following template for an attempted offense:

> (1) That . . . the accused did (a) certain act(s), *that is: (state the act(s) alleged or raised by the evidence)*; (2) That the act(s) (was) (were) done with the specific intent to commit the offense of (state the alleged attempted offense); (3) That the act(s) amounted to more than mere preparation, that is, (it was) (they were) a substantial step and a direct movement toward the commission of the intended offense; and (4) That such act(s) apparently tended to bring about the commission of the offense of (state the alleged attempted offense), (that is, the act(s) apparently would have resulted in the actual commission of the offense of (state the alleged attempted offense) except for (a circumstance unknown to the accused) (an unexpected intervening circumstance) (_____) which prevented completion of that offense).

Department of the Army Pamphlet 27-9 at 177, *Military Judges' Benchbook* (10 Sep. 2014) (*Benchbook*) (emphasis added).

The Government opposed identifying any specific acts which might amount to a substantial step in the instructions. The military judge said the Defense's objection was "definitely noted," but that he would not modify his proposed instructions. He explained:

> It is for the members to determine after considering all the evidence, whether or not the acts that constitute the attempted offense[,] i.e.[,] the substantial step toward the movement of that offense. Whether or not those acts actually meet that element or not is for them to decide and for the [c]ourt to essentially sit down and plug in all of the evidence that may have come out during the trial that the [c]ourt anticipates the Government may argue constitutes evidence of a substantial step. I think would be[,] number one would be somewhat improper for the [c]ourt to plug that in there because of the suggestion that the [c]ourt[']s dictating to the members the scope of the evidence that they can consider[ a]s evidence amounting to a substantial step, but again I do not want to intrude on their ability to decide on their own based on the evidence presented and how [c]ounsel characterize

---

[30] Department of the Army Pamphlet 27-9, *Military Judges' Benchbook* (10 Sep. 2014) (*Benchbook*).

and argue that evidence[, w]hat actually constitutes more than a mere preparation or substantial step.

And so therefore, and based on samples and examples that I have reviewed in the past. [sic] While there may be a circumstance depending on the type of offense charged where it is drafted differently in this particular offense. [sic] I am comfortable plugging in the attempt, the actual nature of the offense that has been attempted. And then leave it to the parties to characterize with regard to elements two and three, excuse me three really, three and four, whether or not the evidence presented meets those elements.

The military judge gave the members the instructions as he had originally proposed. In the Government's closing argument, trial counsel argued, "You either believe that the Accused did a certain number of acts, kissing, and touching, and all that right, a substantial step toward having sex with Ms. [ES] or you do not. I do not know how much more I can say about it."

When the members returned their verdict acquitting Appellant of abusive sexual contact, but convicting him of attempted sexual assault, trial defense counsel moved the military judge to declare a mistrial, explaining that their

> principal concern permeating all of this is that there were no specific acts pled in the Specification of Charge II. . . . [T]here was never any specific articulation in the pleading or otherwise that put [Appellant] on notice of the exact things that he would have done to contemplate or actually complete the attempt.

In addition to asserting Appellant was prejudiced by a lack of notice and that the members' findings were inconsistent, trial defense counsel said the military judge's instruction "caused confusion in such a way and did not properly guide the members on making findings of specific acts." In discussing the matter with counsel, the military judge said,

> The act and I know it sounds inconsistent but I didn't see anything—any legal authority to say otherwise. The act is actually the effort to penetrate the vagina with the penis. That's the act. Whether or not he noticed [sic] substantial step towards completing that act, tried to take off clothes, kissed, held arms, et cetera, those are—that's all facts and circumstances that the members are free to consider when deciding whether or not there was a substantial step towards completion of the act. There is no requirement and we've been over this in the failure to state an offense motion. There is no requirement for the [G]overnment to plead all of that information . . . .

In their written motion for a mistrial, trial defense counsel argued that the military judge's failure to specify particular acts raised by the evidence in his instructions amounted to "an abdication of the judicial role in a members findings case," because doing so "essentially nullified the members having to find anything" with respect to the first element of the offense. In his ruling, the military judge indicated he relied upon *United States v. Payne*, 73 M.J. 19 (C.A.A.F. 2014), to assess the sufficiency of his instructions to the members on the attempt charge, asserting the military judge in that case had instructed the members on the first element "identically" to how he had.[31] He also concluded that—because the Government was not required to allege the specific overt acts it intended to prove in order to establish an attempt charge—the Defense had not shown that a mistrial was "manifestly necessary in the interests of justice."

### 2. Law

In charging an attempted offense under the UCMJ, it is not necessary to allege the overt act or the elements of the underlying predicate, or target, offense, as long as the accused is adequately on notice of the nature of the offense. *United States v. Norwood*, 71 M.J. 204, 206–07 (C.A.A.F. 2012) (citations omitted).

Military judges have a duty to provide instructions which deliver "an accurate, complete, and intelligible statement of the law." *Behenna*, 71 M.J. at 232 (citations omitted). Instructions must be "clear and correctly conveyed." *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011). We review instructions given "to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F. 1996)). "Whether a panel was properly instructed is a question of law reviewed de novo." *United States v. Hale*, 78 M.J. 268, 274 (C.A.A.F. 2019) (quoting *United States v. Medina*, 69 M.J. 462, 465 (C.A.A.F. 2011)). Military judges are required to instruct members on the elements of charged offenses. R.C.M. 920(e)(1).

Instructional errors with constitutional dimensions are tested for prejudice against the standard of "harmless beyond a reasonable doubt." *United States v. Upshaw*, 81 M.J. 71, 74 (C.A.A.F. 2021) (citation omitted). "This standard is met 'where a court is confident that there was no reasonable possibility that

---

[31] Contrary to the military judge's statement, the military judge in *Payne* did instruct the members regarding what the "overt act" was in that case, as the overt act was charged in the pertinent specification. 73 M.J. at 24. The United States Court of Appeals for the Armed Forces concluded other aspects of the military judge's instructions on the attempt specification in *Payne* amounted to plain error. *Id*. at 25.

the error might have contributed to the conviction.'" *Id.* (citing *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020) (quoting *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019))).

### 3. Analysis

On appeal, Appellant concedes the Government was not required to allege any particular overt acts in its charging document, but he argues it was error for the military judge to not list any overt acts in his instructions. Appellant largely points to the *Benchbook* guidance that the military judge should specify the overt acts for the members to consider. The Government responds that the *Benchbook* is merely guidance, and it was within the military judge's discretion whether to identify such facts for the members. The Government also notes that neither of the parties at trial proposed any specific overt acts for the military judge to incorporate into his instruction.[32]

We agree the military judge deviated from the model instruction in the *Benchbook* by not identifying any particular "certain acts" that the Appellant did with the specific intent to commit the offense of sexual assault, but Appellant cites to no authority requiring the military judge to specify these acts for the members in his instructions, and we are aware of none. The *Benchbook* may provide useful guidance to military judges, but military judges are not required to follow it. *See, e.g.*, *United States v. Simpson*, 58 M.J. 368, 378 (C.A.A.F. 2003) (noting military judges are "not required to follow literally the non-binding examples" in the *Benchbook*). The fact the Government is not required to allege any specific act in its charging instrument somewhat undercuts Appellant's argument that the military judge was required to identify such acts for the members. The members, however, were required to find that Appellant did do a certain act; that the act was done with the specific intent to commit an offense under the UCMJ; that the act amounted to more than mere preparation; and that the act tended to effect the commission of the intended offense. 2016 *MCM*, pt. IV, ¶ 4.b.

The flaw here is that—contrary to what he said to the parties at the time—the military judge *did* instruct the members what "certain act" they had to find. He told them they had to be convinced Appellant did the certain act of "attempt[ing] to commit a sexual act upon [Ms. ES], to wit penetrating her

---

[32] Considering the Defense had protested both in pretrial motions and throughout the duration of Appellant's court-martial that the Government had failed to explain what overt acts were being offered to prove the attempted sexual assault offense, it is not particularly noteworthy that the Defense did not volunteer to fill that perceived void for the Government.

vulva with his penis, by causing bodily harm to her, to wit: penetrating her vulva with his penis without her consent." He further told them that in order to find Appellant guilty, they must be convinced beyond a reasonable doubt that this act "apparently tended to bring about the commission of the offense of sexual assault." Thus, the "certain act" identified by the military judge in the first element was the same as the "target" offense of sexual assault in the fourth element.[33] As a result, the military told the members they had to conclude Appellant committed the act of attempting to sexually assault Ms. ES, and that this attempted sexual assault tended to bring about the commission of the offense of sexual assault. In sum, the instructions set up the paradox of Appellant being convicted of attempting to sexually assault Ms. ES based upon Appellant taking the substantial step of attempting to sexually assault her.

Although the military judge was not obligated to identify in his instructions any particular overt act committed by Appellant in furtherance of the attempt, his decision to do so required him to give an instruction which amounted to "an accurate, complete, and intelligible statement of the law." *Behenna*, 71 M.J. at 232. Here, the military judge's instruction called for entirely circular reasoning, instructing the members to determine whether Appellant attempted to sexually assault Ms. ES when he carried out the act of attempting to sexually assault her. Moreover, in light of the requirement to prove Appellant specifically intended to sexually assault Ms. ES in the manner charged, it is entirely unclear how the members could follow the military judge's instruction that they had to be convinced that Appellant attempted to sexually assault Ms. ES with the specific intent to commit sexual assault in the exact same manner he attempted to do so, and that the attempted sexual assault was a substantial step towards committing the same sexual assault. Compounding this issue, by defining the "certain act" as the charged offense, the military judge effectively relieved the members of their obligation to identify a certain act committed by Appellant in furtherance of his alleged intentional attempt to sexually assault Ms. ES—essentially reading an element entirely out of the offense.[34]

---

[33] The military judge himself appeared to acknowledge that he had instructed as such. When discussing the Defense motion for a mistrial, the military judge stated: "The act and I know it sounds inconsistent but I didn't see anything—any legal authority to say otherwise. The act is actually the effort to penetrate the vagina with the penis. That's the act."

[34] To be clear, we do not hold military judges are required to identify particular overt acts in their instructions in every court-martial involving an offense alleged as an attempt. Rather, we hold that when a military judge elects to do so, he or she must ensure those instructions amount to an accurate, complete, and intelligible statement of law.

Finding error, we are confronted with the question of whether the error was harmless beyond a reasonable doubt. We conclude it was not. Unlike the situation in which a military judge omits an element which is fairly encompassed by the remainder of the instructions, the military judge here directed the members to an incorrect evidentiary burden. In instructing on the first element, the military judge identified the "certain act"—the predicate act for the attempt offense—as the ultimate offense. Significantly, each of the remaining three elements, as instructed by the military judge, related back to that certain act which the military judge had explicitly identified. For example, for the third element, the military judge told the members they must be convinced that the "certain act" amounted to a substantial step towards the commission of the intended offense. Because the intended offense was the same as the "certain act" under these instructions, the members were faced with either a tautology or an impossibility in evaluating this element. That is the case because a preparatory step is, by definition, an intermediate point along a path that terminates at the ultimate destination of the intended offense. Yet the members here were told the preparatory step was the same as the intended offense, entirely eliminating the notion of a preparatory step. The same is true of the second element, in which the certain act must be accomplished with the specific intent to commit the intended offense, as well as the fourth element, in which the same certain act must tend to bring about the intended offense.

The Government asserts that the evidence against Appellant was overwhelming in support of its argument that we should find any instructional error harmless. We are not so convinced. The evidence was strong in terms of proving Appellant struggled with Ms. ES while she lay on the couch, but evidence that Appellant specifically intended to penetrate her vulva *without her consent* is far from conclusive. We are also mindful of the fact the members acquitted Appellant of committing abusive sexual contact during this episode. In any event, we presume the members followed—or at least attempted to follow—the military judge's instructions. *See United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000). In doing so, if the members concluded Appellant committed the "certain act" of attempting to sexually assault Ms. ES, as the military judge explained was required for the first element, then the remainder of the elements would simply fall by the wayside as a result of their own internally circular reasoning. This would pave the way for a finding of guilty without careful analysis of each element.

We conclude the military judge's instructions amounted to an erroneous statement of the law, and because we are not privy to what the members made of the instructions, we cannot be confident their verdict was not a product of this error. Therefore, we cannot find the error harmless beyond a reasonable

doubt. We will accordingly we will set aside Appellant's conviction on this specification and set aside his sentence.[35]

## E. Completeness of the Record of Trial

Appellant argues his record of trial is defective and incomplete based on a variety of alleged deficiencies discussed in greater detail below.

### 1. Additional Background

The court reporter detailed to Appellant's court-martial was removed from his court-reporter duties a few weeks after Appellant was sentenced. Presumably due to the court reporter's absence, the military judge certified the record of trial on 20 November 2019. On 7 January 2020, trial counsel certified the transcript stating he had reviewed the transcript in its entirety and that he determined "it is an accurate reflection of the proceeding of the court." The memorandum also notes what software the originally detailed court reporter had used.

### 2. Law

Whether a record of trial is complete is a question of law we review de novo. *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000).

Appellant's charges were referred to a general court-martial on 12 April 2019, which is after the 1 January 2019 effective date of the Military Justice Act of 2016. *See* Executive Order 13,825, § 5. This act, *inter alia*, made substantial changes to the post-trial processing of courts-martial. Prior to 2019, a verbatim transcript would be prepared in any case with a sentence including either a punitive discharge or at least 12 months of confinement, and a record of trial was incomplete without such a transcript. R.C.M. 1103(b)(2)(B), 1103(b)(2)(D) (2016 *MCM*). In the event a verbatim transcript could not be prepared due to loss of recordings or notes or for some other reason, a convening authority had the option of either ordering a rehearing or only approving a sentence which included neither a punitive discharge nor more than six months of confinement. R.C.M. 1103(f) (2016 *MCM*). Once the record—to include the transcript—was prepared, the military judge would authenticate the

---

[35] We recognize that, in at least two other cases reviewed by this court, military judges gave similar instructions on attempt offenses. *See United States v. Brown*, No. ACM 39728, 2021 CCA LEXIS 414, at *12 (A.F. Ct. Crim. App. 16 Aug. 2021) (unpub. op.); *United States v. Little*, No. ACM 38338, 2014 CCA LEXIS 689, at *10 (A.F. Ct. Crim. App. 19 Sep. 2014) (unpub. op.). Neither of those unpublished opinions addressed the propriety of the instructions' identifying the predicate act as the same as the target offense. We note that both cases involved convictions for attempt as a lesser-included offense of a charged offense. For these reasons, those two cases provide little guidance for our resolution of Appellant's case.

record prior to its service on the accused and transmission to the convening authority. R.C.M. 1104 (2016 *MCM*).

Under the rules which went into effect 1 January 2019, the contents of a record of trial initially compiled at the conclusion of a court-martial no longer include a transcript of the proceedings—instead, a "substantially verbatim *recording*" of the proceedings is called for, R.C.M. 1112(b)(1) (emphasis added), a copy of which the accused is entitled to, R.C.M. 1106(c). In addition to the recording, a complete record of trial includes such matters as the charge sheet, exhibits, the statement of trial results, and the judgment entered by the military judge. R.C.M. 1112(b), 1112(d)(2). The court reporter certifies the contents of the record of trial, but the military judge may certify the record if the court reporter is unable to do so. Art. 54(a), UCMJ, 10 U.S.C. § 854(a); R.C.M. 1112(c). If the record is found to be incomplete or defective prior to certification, the matter may be raised to the military judge for correction; after certification, the record may be returned to the military judge for correction. R.C.M. 1112(d)(2). Once the record of trial is certified, a copy is provided to the accused; however, sealed exhibits and recordings of closed sessions are omitted. Art. 54(d), UCMJ; R.C.M. 1112(e).

Under the rules now in effect, a certified verbatim transcript of a record of trial shall be prepared in any court-martial in which a punitive discharge or confinement for more than six months is adjudged. R.C.M. 1114(a)(1). The transcript is attached to the record of trial. R.C.M. 1114(d). This transcript, however, is not part of the original record of trial the court reporter certifies—instead, the transcript is attached to the record before the record is forwarded for appellate review. R.C.M. 1112(f)(1)(8). When such a transcript is prepared, the accused and his or her counsel may be provided a copy upon request. R.C.M. 1114(b), Discussion. A copy of the entire record and attachments, which would include the transcript, "shall be forwarded to a civilian counsel provided by the accused" upon written request of an accused. R.C.M. 1116(b)(1)(B).

Unlike the rules in place prior to 1 January 2019, the current rules have no provision granting sentence relief in the case of a defective record of trial. Moreover, these rules contain no provision regarding the correction of inaccurate or incomplete transcripts.

**3. Analysis**

Appellant points to a number of purported deficiencies with the record of trial which we will address in turn.

First, Appellant contends the record of trial fails to include a video file which was never marked as an appellate exhibit or reviewed by the military judge. This video is discussed in greater detail below in Section II.F., *infra*. In short, the Defense sought permission in a Mil. R. Evid. 412 hearing to question

Ms. KT about the contents of a particular video. Trial defense counsel commented that the military judge did not have a copy of the video, and he asked the military judge: "Does the [c]ourt require that or is the [c]ourt willing to take the proffer[?]" The military judge said he did not need to see the video to rule on the motion and that the video would not be attached to the record as an appellate exhibit. The military judge then denied the Defense's motion.

A record of trial includes "any evidence or exhibits considered by the court-martial in determining the findings or sentence." R.C.M. 1112(b). Nothing in this rule requires inclusion of items never viewed or considered by a military judge on an interlocutory matter. We are aware of no rule, precedent, or other legal authority requiring the attachment of such items to a record, and Appellant cites none. Appellant's claim on this point is without merit.

Second, Appellant notes there are several comments in the court reporter chronology—included in the record—suggesting "various instances of problems encountered" in the preparation of the record.[36] He highlights four particular entries—two entries indicate trial counsel located missing audio; the third states the audio and the "Log Notes" did not match; and the fourth says two of the days of transcript were reviewed "due to significant amounts of missing transcription." Appellant, who has access to the original audio recording of his trial, does not contend the transcript is inaccurate in any way or that the final transcript omits any portion of the trial. Appellant does not explain the relevance, if any, of the comment about the audio and the notes not matching, and we see nothing in the record illuminating the matter. Even if Appellant were to demonstrate the transcript is inaccurate, the current Rules for Courts-Martial afford him no relief because it is the audio recording that is a component of the certified record of trial; the transcript is a matter attached for appellate review under R.C.M. 1112(f). While we can envision a transcript so inaccurate as to amount to prejudicial error, Appellant has not approached that threshold, and he is not entitled to relief based upon the four comments he identified in the chronology.

Third, although the military judge ordered numerous documents to be sealed during Appellant's court-martial, many were not in fact sealed when the

---

[36] The Government's answer and Appellant's reply brief both reference chronologies which were included in the record of trial docketed with our court. The parties have not taken a position as to whether these chronologies are part of the "record" as defined in R.C.M. 1112(b), "attachments for appellate review" under R.C.M. 1112(f), matters that we may consider because both parties have referenced them in their briefs, without objection, or something we may not consider on appeal under *United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020). We assume without deciding that we may consider the chronologies, as neither party objected to them at any point. *See United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021).

record of trial was assembled. We are aware of this error, as we ordered the documents to be sealed once we discovered them in our review. According to Appellant, he received these documents, unsealed, when he received his record of trial in January 2020. While this was unquestionably an error denoting a lack of diligence in the preparation of the record of trial, Appellant has identified no prejudice he has suffered, and we are aware of none. As such, Appellant is entitled to no relief. Although we grant no relief, we pause to note that it was the military judge who certified this record of trial as being "accurate and complete" on 20 November 2019. The fact that he apparently did not notice the matters he ordered sealed were not actually sealed indicates his review was less than thorough.[37]

Fourth, Appellant states the second page of the Defense's written motion for a mistrial is missing, having been replaced with an email. The record filed with this court, however, suffers no such infirmity—the second page of the motion in that record is the second page of the Defense's motion. Without objection from Appellant, the Government has provided this court with a certificate of receipt in which Appellant's military appellate defense counsel signed for receipt of "disc(s)" containing three items, one of which was the second page of the motion in question. The receipt is dated 13 April 2021, which was more than a month after Appellant filed his assignments of error. Appellant, however, submitted a reply brief on 27 April 2021 and did not revisit this asserted error, indicating to us a lack of prejudice. Having reviewed the page, we conclude Appellant was not prejudiced, especially since he possessed the transcript of the on-the-record discussion of the matter and the military judge's ruling. Although Appellant's copy of the record should have included the missing page, we are not inclined to find prejudicial error from a single errant page out of a ten-volume record, especially when his counsel had the ready ability to inspect the record filed with this court that included the correct page.

Fifth, Appellant states the first segment of a video file of Ms. KT's law enforcement interview "does not play." In response, the Government notes that in the court-martial transcript, trial defense counsel told the military judge which particular video program to use to play back the recording. The Government also avers it gave Appellant's appellate counsel a new copy of the first segment of the interview on 13 April 2021. As with the missing motion page, Appellant did not readdress or attempt to demonstrate prejudice in his reply brief. We note that the recording in the record of trial docketed with this court

---

[37] We remind all involved with the preparation and certification of records of trial to approach these duties with the careful attention to detail which is warranted by the gravity of military justice proceedings. When matters filed under seal are subsequently released with no protection, the important policy reasons for sealing them are entirely compromised.

was readily viewable using the software trial defense counsel specified at trial. Based upon the matters before us, we are unable to determine if Appellant received a corrupted copy of the video file or if his counsel was utilizing incompatible software when attempting to view it. In any event, Appellant has not demonstrated prejudice to his case, and we will not strain to find any.

Sixth, Appellant alleges his copy of the record "does not contain any of the exhibits that were included in the [record] on disc." He identifies one exhibit in particular: Appellate Exhibit XLII. This exhibit, however, is not an electronic exhibit at all; it is a paper copy of a single page of notes taken from the Air Force Office of Special Investigation's report of investigation concerning Appellant's charged offenses. The only electronic evidence in the record docketed with our court is the video recording of Ms. KT's interview with law enforcement agents, and we know Appellant received that item, as he complained about his inability to play the first segment of it. Appellant identifies no exhibits he has not been provided on a disc or otherwise, and we are aware of none. To the extent Appellant is asserting he received copies of paper exhibits only in an electronic format, we would find no prejudice so long as he received the exhibits in either format.

Seventh, Appellant argues a court reporter was required "to attest to the accuracy and completeness of the record of trial." He submits that trial counsel's certification was insufficient because trial counsel "lacked personal knowledge of the specific equipment and versions of the software used" either by the originally detailed court reporter or the other court reporters involved in the transcription. We note as an initial matter Appellant has failed to demonstrate that trial counsel did not actually know what equipment or software the court reporters used. Appellant bases his argument that a court reporter, and not trial counsel, must certify the transcript, on a provision found in Air Force Manual (AFMAN) 51-203, *Records of Trial* (4 Sep. 2018, as amended by Air Force Guidance Memorandum 2019-01, 9 May 2019).[38] We assume, even though Appellant argues here that a court reporter must certify the record of trial, that he is actually referring to the transcript, as the provision he highlights calls upon the court reporters involved to "certify[ ] the quality, authenticity of the transcript or portion of the transcript, and method used to transcribe the proceeding." AFMAN 51-203, ¶ 14.14. This AFMAN and the related Guidance Memorandum explain they were issued by order of the Secretary of the Air Force, and compliance with both is mandatory. Given that neither document purports to authorize trial counsel to certify a transcript of

---

[38] This was the version of the manual in effect at the time of Appellant's court-martial. It has since been replaced by Department of the Air Force Manual 51-203, *Records of Trial* (21 Apr. 2021).

court-martial proceedings, trial counsel's certification here arguably ran afoul of their requirements. Appellant has identified no prejudice from this error, and we perceive none—especially because Appellant has access to the recording of his court-martial and he has not identified any transcription errors, let alone demonstrated how any such errors might have prejudiced him.

Lastly, Appellant argues that because of the foregoing claimed errors, "the entire record has been called into question," and we should reassesses his sentence "to a level not exceeding that permissible in a trial reported by a non-verbatim transcript." Appellant relies on the rules in place before 1 January 2019 for this proposition, but as explained above, that sentence remedy for a non-verbatim transcript no longer exists. Our reading of the applicable rules is that the audio recording is now the primary record of the proceedings, and the written transcript of those proceedings is created to facilitate appellate review. A record of trial is complete if it includes the required items listed in R.C.M. 1112(b), and Appellant has not demonstrated any of those items are actually missing, with the exception of a single page of one motion in Appellant's copy of the record of trial—as opposed to the original record which contains no such omission—an error from which Appellant asserts no prejudice, and has, in any event, been remedied. Even if the record was incomplete or defective, the remedy would not be to grant Appellant sentencing relief, but rather, to return the record for correction. Because we *sua sponte* ordered the Government to seal the unsealed matters in the record, the sole remaining defect is the fact the transcript was certified by trial counsel rather than by the court reporters, as required by AFMAN 51-203. Finding no prejudice to Appellant flowing from this shortcoming, we grant no relief. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a).

## F. Military Judge's Ruling on Explicit Videos

Appellant personally raises the claim that the military judge erred in ruling evidence regarding sexually explicit mobile phone videos was inadmissible under Mil. R. Evid. 412.[39]

---

[39] This issue was raised during a closed hearing, the transcript of which was sealed by the military judge. We limit our discussion of sealed material to that which is necessary for our analysis.

### 1. Additional Background

Prior to trial, the Defense sought permission, via written motion, to admit evidence that Appellant and Ms. KT had recorded their consensual sexual conduct the weekend of the charged assault.[40] The Defense offered four theories for the admissibility of the evidence. First, the Defense argued the fact Appellant and Ms. KT recorded their conduct—taken together with all other consensual conduct between the two—was evidence Ms. KT actually consented to the conduct forming the basis of the alleged assault, or that Appellant was reasonably mistaken as to whether she had consented or not. Second, the Defense postulated that one or more of the videos might be recordings of the alleged assault itself and would be evidence no assault occurred. However, pointing to the Government's denial of the Defense expert computer assistance, trial defense counsel conceded they were unable to specifically determine when the recordings were made. Third, the Defense argued the videos would "serve two crucial impeachment functions" by demonstrating possible motives for Ms. KT to make a false allegation of sexual assault. In essence, the Defense suggested Ms. KT regretted participating in the recordings, and she might have accused Appellant of assaulting her in order to persuade Appellant to dispose of the recordings. The other theory advanced by the Defense was that one of the recordings depicted Ms. KT making a comment which could be interpreted as a desire to have unprotected sex with Appellant. Thus, the theory continued, when Ms. KT later came to regret having had unprotected sex with Appellant, and after she used an emergency contraceptive, she falsely accused him of sexually assaulting her.

Finally, the Defense argued the recordings should be available to Appellant to confront Ms. KT by challenging her credibility with prior inconsistent statements. The Defense asserted that during the investigation, Ms. KT discussed the videos with investigators, and she told them she did not agree to or assist in making the recordings. The Defense further asserted Ms. KT told investigators she took the phone away from Appellant when she realized he was using it to record the two of them. The Defense claimed that one video showed Ms. KT actively participated in the filming and argued that Ms. KT's purportedly untruthful statements to the investigators implicated Appellant's constitutional confrontation rights, insofar as they implicated Ms. KT's credibility and the overall veracity of her allegations.

In their written motion, trial defense counsel offered conflicting statements about whether they wished to admit the videos themselves into evidence or to

---

[40] The parties alternated between referring to multiple videos and referring to just a single video. For purposes of our analysis, we will assume there was more than one video.

simply ask Ms. KT about them. At one point, the motion states, "To be clear . . . the Defense is not seeking to play this tape for members—but rather cross examine [Ms. KT] about its existence, content, and her state of mind when making it." In the very next paragraph, however, the Defense argued the members "would be lost in the dark as to the true nature of the quickly-escalating sexual relationship between [Ms. KT] and [Appellant] if they do not get to observe the actual sex between the two." In the next paragraph, the Defense stated, "at least cross examination about these videos should be permitted," and only "the video of the charged event" should be admitted as substantive evidence or impeachment. When discussing the admissibility of the recording with the military judge, trial defense counsel said, "I apologize if I didn't make that clear. I do not intend to play the video. We are asking for the [c]ourt's permission to be able to ask questions about the video."

Trial counsel objected to any discussion of the videos, arguing in their written response to the Defense's motion that the fact Ms. KT and Appellant may have agreed to record sexual contact had "marginal probative value" but "an exceptionally strong risk of prejudice."[41] The Government did not specifically address the Defense's theories of admissibility of the videos.

During the motions hearing on Friday, 23 August 2019, the military judge expressed skepticism that the Defense should be allowed to impeach Ms. KT with respect to what she told the investigators about the videos. He told trial defense counsel,

> You can't just simply ask someone a question about something that you know they're going to say something about that—that opens the door to be able to bring in extrinsic evidence of the falsity. The purpose about asking about this particular instance in the first place would have to satisfy, at a minimum, the relevancy standards necessary before you can even ask about this. If this is independently irrelevant, you don't necessarily get to talk about it.

The military judge did not view the videos or have them marked as appellate exhibits. Nonetheless, the military judge made findings of fact regarding the contents of one video in his written ruling on the Defense's motion. His description of the video's contents largely tracked the Defense's proffer of what the video depicted, thus indicating Ms. KT may not have been truthful to the investigators. He did not, however, make any findings of fact regarding Ms.

---

[41] Ms. KT, through her special victims' counsel, objected to admission of the videos, but did not object to being questioned about whether she made inconsistent statements with respect to them.

KT's statements to the investigators. The military judge ruled evidence about the video was inadmissible under Mil. R. Evid. 412(b)(2) as it did not make it any more or less likely that Appellant had a reasonable mistake of fact as to Ms. KT's consent with respect to the charged assault. The military judge also ruled the evidence was not constitutionally required, but he did not explain his rationale for that conclusion. The military judge did not discuss at all trial defense counsel's desire to impeach Ms. KT with the purportedly false statement she made to the investigators about the recordings. Although the "law" section of the military judge's ruling set out the principles of impeachment by contradiction and an accused's constitutional right to confront witnesses, his "discussion" section did not address these matters with respect to the recordings.

### 2. Law

We review a military judge's ruling that excludes evidence under Mil. R. Evid. 412 for an abuse of discretion. *United States v. Erikson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citation omitted).

Under Mil. R. Evid. 412, evidence of an alleged victim's sexual predisposition and evidence that an alleged victim engaged in other sexual behavior is generally inadmissible. Mil. R. Evid. 412(a). The intent of the rule is to "shield victims of sexual assaults from the often embarrassing and degrading cross-examination and evidence presentations common to sexual offense prosecutions." *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (original alteration, internal quotation marks, and citations omitted). One exception to this rule is when evidence is offered to prove consent. Mil. R. Evid. 412(b)(2). A second exception is when exclusion of the evidence would violate an accused's constitutional rights. Mil. R. Evid. 412(b)(3). In order to show that the exclusion of evidence would violate an accused's constitutional rights, the accused must show that the evidence is relevant, material, and favorable to his defense, "and thus whether it is necessary." *United States v. Banker*, 60 M.J. 216, 222 (C.A.A.F. 2004) (internal quotation marks and citation omitted). The term "favorable" means the evidence is "vital." *United States v. Smith*, 68 M.J. 445, 448 (C.A.A.F. 2010) (citations omitted). It is the defense's burden to demonstrate an exception applies. *Banker*, 60 M.J. at 223.

Evidence which is relevant under Mil. R. Evid. 412(b)(2) may be admissible if the military judge determines the probative value of such evidence outweighs the danger of unfair prejudice to the victim's privacy and otherwise outweighs the dangers of unfair prejudice under a Mil. R. Evid. 403 analysis. Mil. R. Evid. 412(c)(3). Evidence falling under the Mil. R. Evid. 412(b)(3) exception is not weighed against a victim's privacy and is instead only analyzed under Mil. R. Evid. 403. *Id*. Evidence challenging the credibility of key government witnesses may fall under this exception. *See, e.g.*, *United States v. Williams*, 37 M.J. 352, 360–61 (C.M.A. 1993).

Under the Sixth Amendment, an accused has the right to confront the witnesses against him or her. This right necessarily includes the right to cross-examine those witnesses, which "is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). However, judges "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011) (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The test for determining whether an accused's confrontation clause rights have been violated is whether a "reasonable jury might have received a significantly different impression of [the witness]'s credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Id.* (alterations in original) (quoting *Van Arsdall*, 475 U.S. at 680).

Military judges may permit counsel to inquire about specific instances of a witness's conduct on cross-examination if they are probative of the witness's character for truthfulness or untruthfulness. Mil. R. Evid. 608(b). Extrinsic evidence of such is generally inadmissible. *Id.* Military judge's rulings which limit cross-examination under Mil. R. Evid. 608(b) are reviewed for an abuse of discretion. *United States v. Stavely*, 33 M.J. 92, 94 (C.M.A. 1991). However, when an error at trial is of constitutional dimensions, we assess de novo whether the error was harmless beyond a reasonable doubt. *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020).

**3. Analysis**

On appeal, Appellant argues the military judge did "not consider and analyze the facts presented to him regarding [Ms. KT's] claim to [investigators] about the nonconsensual nature of the recording," and therefore abused his discretion. The Government contends that Ms. KT's statement to investigators was more ambiguous than the Defense claims, that the matter was collateral, and that, in any event, the military judge's ruling was correct under Mil. R. Evid. 412.

As the sole witness to the charged assault, Ms. KT's credibility was a critical issue in Appellant's court-martial. *See, e.g.*, *United States v. Jasper*, 72 M.J. 276, 281 (C.A.A.F. 2013) (noting, in a child sexual assault case, "[t]here is little question that . . . the credibility of the putative victim is of paramount importance"). Indeed, we would think it the rare and unusual case where an accuser's credibility is *not* an issue available for defense exploration at trial. We agree that to the extent Ms. KT made false statements to investigators in the midst of an interview about the charged offense, and about matters closely re-

lated to that offense, such would reflect poorly on her character for truthfulness. *See, e.g.*, *United States v. Montgomery*, 56 M.J. 660, 667 (A. Ct. Crim. App. 2001) ("[W]hether or not an individual lies to a police officer is highly probative of that individual's veracity."). Given the significance of Ms. KT's credibility, Appellant's right to confront her by attacking that credibility was impaired by the military judge's prohibition of the Defense's proposed cross-examination.

Ordinarily, we would grant military judges deference with respect to rulings on such evidence, but the military judge here did not analyze this proposed use of the evidence at all; instead, he focused on whether the evidence was admissible under a theory of consent under Mil. R. Evid. 412(b)(2). Although he found that the evidence was not "constitutionally required," this finding was made almost in passing in the middle of a longer discussion about whether the evidence related to consent or a mistaken belief of consent. The Defense, however, articulated that an alternate purpose of the evidence was to undermine Ms. KT's credibility by cross-examining her about purportedly false statements she made about the evidence. As explained above, one of the Defense's overarching theories was that Ms. KT fabricated the assault, and she possibly did so under the influence of her mother. Thus, the motive and desire to use the evidence to impeach Ms. KT's character for truthfulness or to establish a character of untruthfulness was plainly articulated by the Defense. Because the military judge's ruling did not address this theory of admissibility, the military judge likewise did not conduct a Mil. R. Evid. 403 analysis of the probative value of allowing the Defense's proposed cross-examination to undermine Ms. KT's credibility. Her credibility was a critical issue at trial, and upon our de novo review, we find the military judge erred in concluding the exclusion of apparently false statements made by Ms. KT during her interview with law enforcement would not violate Appellant's constitutional rights.

Having found error related to Appellant's constitutional right to confront one of the witnesses against him, we turn to our assessment of whether or not the error was harmless beyond a reasonable doubt. We conclude it was. For one, Ms. KT's testimony—while important—was not the sole source of the evidence against Appellant. Post-assault text messages between Appellant and Ms. KT were admitted in evidence at trial. As discussed in more detail in Section II.B.3.d., *supra*, in those messages, Appellant made significant admissions—such as, "I should have stopped and listened to you."

We are also convinced that permitting Appellant to question Ms. KT about her statements to law enforcement regarding the recordings would not have meaningfully undermined her credibility. Ms. KT did not deny to the investigators that the recordings existed, but rather, denied she actively participated in their creation. This was a rather fleeting aspect of a lengthy interview and

was not a subject either dwelled upon or returned to. Moreover, given the embarrassing nature of the topic, her apparent minimization of her role in recording sex acts between herself and Appellant does not render the remainder of her testimony any less believable. Thus, we conclude, a reasonable jury would not have received a significantly different impression of Ms. KT's credibility had the Defense been permitted to cross-examine her on this point. We further find, beyond a reasonable doubt, that the outcome of Appellant's trial with respect to the specification in which Ms. KT was a named victim would have been the same even with this cross-examination.

### III. CONCLUSION

The finding of guilty as to Charge II and its Specification is **SET ASIDE** and **DISMISSED WITHOUT PREJUDICE**. The sentence is **SET ASIDE**. A rehearing is authorized with regard to the dismissed charge and specification and the sentence. The remaining findings are correct in law and fact, and are **AFFIRMED**. Article 66(d), UCMJ, 10 U.S.C. § 866(d). The record of trial is returned to The Judge Advocate General. Article 66(f), UCMJ, 10 U.S.C. § 866(f). Thereafter, Article 66(b), UCMJ, 10 U.S.C. § 866(b), will apply. The court's earlier opinion of *United States v. Martinez*, No. ACM 39903 (f rev), 2022 CCA LEXIS 202 (A.F. Ct. Crim. App. 31 Mar. 2022) (unpub. op.), is hereby withdrawn.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court